UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


PATRICK L. BAUDE, LARRY J. BUCKEL,   )
KITTY BUCKEL, J. ALAN WEBBER,        )
JAN WEBBER, and                      )
CHATEAU GRAND TRAVERSE, LTD.,        )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             )          1:05-cv-0735-JDT-TAB
                                     )
DAVID L. HEATH, in his official capacity as )
Chairman of the Indiana Alcohol and  )
Tobacco Commission,                  )
                                     )
          Defendant,                 )
                                     )
           and                       )
                                     )
WINE AND SPIRITS WHOLESALERS         )
OF INDIANA,                          )
                                     )
          Intervenor-Defendant.      )


**Entry on Plaintiffs' Second Motion for Summary Judgment (Doc. No.  89),
Defendant's Second Cross-Motion for Summary Judgment (Doc. No. 102),
Intervenor-Defendant's Cross-Motion for Summary Judgment (Doc. No. 106), and
Plaintiffs' Motion to Strike Intervenor-Defendant's Notice of Supplemental
Authority (Doc. No. 146)**


        This litigation challenges the constitutionality of Indiana laws that allegedly

restrict the ability of wineries, and out-of-state wineries in particular, to sell their product

directly to Indiana residents, primarily by orders placed by telephone or over the

Internet.

The Plaintiffs are a Michigan winery, Chateau Grand Traverse, Ltd. ("Grand Traverse"), and five individuals, Patrick L. Baude, Larry J. Buckel, Kitty Buckel, J. Alan Webber, and Jan Webber (collectively the "Consumer Plaintiffs), who may be characterized as wine connoisseurs.  They have filed a civil rights action, pursuant to 42 U.S.C. § 1983, seeking a declaratory judgment that Indiana's regulatory scheme violates the Commerce Clause of the Constitution.  They also are seeking a court order requiring the State of Indiana ("State") to permit out-of-state wineries to sell and deliver their product directly to Indiana residents.

This is not the first time that a group of wine connoisseurs has challenged Indiana's authority to regulate direct shipments of wine.  Several years ago, another group of  wine consumers represented by two of the same attorneys in this action, brought a similar suit that was ultimately unsuccessful.  The Seventh Circuit ruled that Indiana could prohibit the direct shipment of wines to Indiana residents.  *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 854 (7th Cir. 2000).

Since then, the legal landscape has changed.  In 2005, the Supreme Court held that a state could not discriminate against out-of-state-wineries by prohibiting them from shipping wine directly to consumers if the state's laws allow in-state wineries to do so. *Granholm v. Heald*, 544 U.S. 460, 493 (2005).  The Court ruled that the Twenty-first Amendment, which repealed Prohibition but allowed states to regulate the sale and distribution of alcohol, did not override the requirements of the Commerce Clause.  *Id.* (This is the constitutional provision that gives Congress the authority to regulate

ii

interstate commerce and by implication restricts states from interfering in the interstate flow of goods, an implication often referred to as the Dormant Commerce Clause.)

In keeping with *Granholm*, the regulatory setting changed, also.  Indiana revised its laws to allow wineries to sell their product on their premises, at a non-profit farmer's market, at three alternative locations, or directly to non-Indiana customers.  Wineries could also obtain a permit allowing them to ship wine directly to Indiana customers with whom there had been at least one face-to-face transaction, allowing the winery to verify the customer's age.

Grand Traverse contends the rules governing this scheme effectively prevent it, and other out-of-state wineries, from competing in the direct sale market in Indiana. The Consumer Plaintiffs contend they are barred from obtaining many wines they desire because of the impracticality of traveling to out-of-state wineries to purchase these wines or to complete the "face-to-face" transaction needed to place further sales over the Internet, by telephone, or by mail.

Additionally, the Plaintiffs contend that Indiana's regulations effectively discriminate against out-of-state wineries because Indiana prohibits a winery from obtaining a direct sales permit if it holds a wholesale license.  They note that many states, including the heavy wine-producing states of California, Oregon, and Washington, provide wholesale privileges to all wineries as part of their basic licensing procedures.  These wineries are therefore excluded from obtaining a direct wine

iii

shipping permit regardless of whether they wholesale any of their wine, in Indiana or elsewhere.

The Defendant, who is Indiana Alcohol and Tobacco Commission Chairman David L. Heath in name but the State in fact, and the Intervenor-Defendant, the Wine and Spirits Wholesalers of Indiana ("Wholesalers"), contend the laws do not discriminate against out-of-state wineries. They assert that the laws are needed to prevent the sale of alcohol to minors and that the State's interest in protecting its youth outweighs any incidental burdens on interstate commerce.

The Wholesalers, joined by the State in part, also argue that the litigation is not yet ripe, that Plaintiffs have not shown that they have any interests at stake, and that the laws are needed to protect Indiana's three-tier system in which producers must sell their liquor to wholesalers who in turn must sell to retailers before the alcohol reaches consumers.

Similar post-*Granholm* litigation contesting state laws that limit the ability of out-of-state wineries to sell their goods directly has occurred in Delaware, Kentucky, Maine, Pennsylvania, Oklahoma, Tennessee, and Washington.[1]  These lawsuits reflect the

---

[1] *See Hurley v. Minner*, No. CIV 05-826, 2006 WL 2789164, at *6-7 (D. Del. Sept. 26, 2006) (upholding state laws that allowed wineries to sell directly to consumers on their premises but prohibited all wineries, including in-state wineries from shipping to consumer's homes); *Cherry Hill Vineyards, LLC v. Hudgins*, No. 3:05CV-289, 2006 WL 3791986, at *21 (W.D. Ky. Dec. 26, 2006) (finding a statute limiting direct shipments to wines that have been purchased in person to be unconstitutional but upholding other post-*Granholm* revisions to its winery laws); *Cherry Hill Vineyard, LLC v. Baldacci*, Civil No. 1:05-0153 (D. Me. Mar. 5, 2007) (adopting magistrate's decision, Civil No. reported at 2006 WL 2121192, at * *9 (July 27, 2006), upholding law that allowed direct wine sales only on the wineries premises); *Cutner v. Newman*, 398 F.

(continued...)

iv

evolution of the Internet, and the challenges it presents to traditional three-tier regulatory structures such as Indiana's.

Indiana's current laws are not unique in their general outline.  First they protect wholesalers from any substantial encroachment upon their hold over the wholesale wine market in Indiana.  Second, they allow Indiana's still relatively small wine industry, many with sales too inconsequential for a wholesaler's profitable consideration, to sell directly to the public.  This much is plain – from the wording of statutes and the record of this case.

The issue before the court is whether this regulatory scheme clearly discriminates against out-of-state wineries, and if so, whether the State has shown it has a legitimate purpose for this discrimination and that it cannot achieve its ends through less discriminatory means.  If the statutes are not clearly discriminatory, then Plaintiffs must show that the burden on interstate commerce is clearly excessive.

All three parties are seeking judgment as a matter of law.  Before the court are Plaintiffs' Second Motion for Summary Judgment (Doc. No. 89), State's Second Cross-

---

[1](...continued)
Supp. 2d 389, 391 (E.D. Pa. 2005) (enjoining a state from enforcing a prohibition of direct shipments by out-of-state wineries so long as in-state wineries were permitted to do so); *Action Wholesale Liquors v. Okla. Alcoholic Beverage Laws Enforcement Comm'n*, 463 F. Supp. 2d 1294, 1305 (W.D. Okla. 2006) (finding a Commerce Clause violation in laws that allowed in-state wineries but not out-of-state wineries to ship wine directly to retailers and restaurants); *Jelovsek v. Bresden*, 482 F. Supp. 2d 1013, 1022-23 (E.D. Tenn. 2007) (upholding a law that allowed in-state wineries to sell directly on their premises but banned in-state and out-of-state wineries from shipping to consumer's homes); *Costco Wholesale Corp. v. Hoen*, 407 F. Supp. 2d 1247, 1248 (W.D. Wash. 2005) (finding statutes that only allowed in-state wineries and breweries to sell directly to retailers to be unconstitutional).

Motion for Summary Judgment (Doc. No. 102), and the Wholesalers' Cross-Motion for

Summary Judgment (Doc. No. 106).  Additionally, Plaintiffs contend that the

Wholesalers disregarded the court's scheduling deadlines for argument.  Plaintiffs have

filed a Motion to Strike Wholesalers' Unauthorized Supplemental Brief Denominated a

"Notice of Supplemental Authority" (Doc. No. 146).[2]

This court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1331, and

the parties have briefed the pending motions.  Also participating, as amicus curiae on

the issue of remedy, is the Indiana Winegrowers Guild ("Winegrowers"), an organization

representing Indiana wineries.

The court rules as follows.

---

[2]  Oral argument was held on the motions at issue.  The court compliments all counsel who presented those arguments.  They were well done and helpful to the court's understanding of the issues.

# TABLE OF CONTENTS

I.  PRELIMINARY MATTER OF PLAINTIFF'S MOTION TO STRIKE . . . . . . . . . . . . . .  1

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    A.  Standing and Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    B.  Commerce Clause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

        1.  Commerce Clause Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

        2.  Indiana's Regulatory Scheme  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

            a.  The Farm Winery Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

            b.  Direct Wine Seller Prohibition  . . . . . . . . . . . . . . . . . . . . . . . .  29

                i.  The Wholesale Interest Prohibition  . . . . . . . . . . . . . .  29

                ii.  The Face-to-Face Requirement  . . . . . . . . . . . . . . . .  41

                iii.  Other Contested Provisions  . . . . . . . . . . . . . . . . . . . .  50

    C.  Remedy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

## I.  PRELIMINARY MATTER OF PLAINTIFF'S MOTION TO STRIKE

The Plaintiffs and the State have objected to the admissibility of various

evidence submitted by the parties and have asked the court to strike this evidence from

consideration.  To the extent that the evidence is material, the court addresses the

parties' objections in the discussion that follows.

Plaintiffs also moved to strike Wholesalers' Notice of Supplemental Authority

(Doc. No. 145) as an unauthorized brief filed outside the case management schedule

for briefing.  (Pls.' Mot. Strike 1.)  The notice, filed March 29, 2007, called the court's

attention to *American Civil Liberties Union v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa.

2007), which addressed the constitutionality of the Child Online Protection Act.

Wholesalers filed the notice to bring this court's attention to the decision's findings of

fact and conclusions of law regarding the efficacy of data verification services.

As the parties are aware, a district court's conclusions of law are not precedent

but may be considered if persuasive.  However, they are of limited value when based on

evidence not before this court.  Moreover, as will become apparent below, the issues

addressed in *Gonzales* are not greatly material to the issues before the court.

Motions to strike and other collateral motions in summary judgment proceedings

are disfavored under local rule.  S.D. Ind. L.R. 56.1(f).  While Wholesaler's notice was

longer than needed to draw the court's attention to the decision, its submission did not

amount to a substantial disregard of the case management schedule.

1

For these reasons, Plaintiffs' Motion to Strike Wholesalers' Unauthorized Supplemental Brief (Doc. No. 146) is **DENIED**.

## II.  BACKGROUND

Like most states Indiana has regulated the sale of alcohol since Prohibition through a three-tier system of distribution.  Producers could not sell alcoholic beverages directly to retailers or consumers but had to sell to wholesalers.  This system aided the state in regulating the sale of alcohol and in collecting taxes because all liquor taxes could be collected at the wholesale level.  Until recently, a wholesaler had to be based in Indiana or have substantial Indiana ownership.  The industry was regulated by the state Alcoholic Beverage Commission, often known as the ABC board, until the agency was renamed the Alcohol and Tobacco Commission ("Commission") in 2001.

Despite this regulatory framework, Indiana allowed in-state wineries to ship wines directly to their customers.  In a letter of December 29, 1978, the ABC affirmed its understanding that licensed wineries would use United Parcel Service to deliver wine. This practice continued even as wineries and wine connoisseurs began challenging the prohibitions of direct wine shipments.  A group of connoisseurs filed suit in the Northern District of Indiana in August 1998, the same month that a statute took effect that made it unlawful for anyone outside of Indiana to ship an alcoholic beverage to anyone in Indiana other than a licensed wholesaler.[3]  *See Bridenbaugh v. O'Bannon*, 78 F. Supp.

---

[3]  From July 1998 through March 24, 2006, Indiana Code § 7.1-5-11-1.5 read in part, "It is unlawful for a person in the business of selling alcoholic beverages in another state or country (continued...)

2

2d 828, 829-30 (N.D. Ind. 1999), *rev'd Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848 (7th Cir. 2000).  The district judge held the law unconstitutional but the Seventh Circuit reversed, finding the Twenty-first Amendment authorized the state to regulate imports.

The Supreme Court handed down its decision in *Granholm* on May 16, 2005, and two days later Plaintiffs filed their initial complaint in this litigation, arguing that Indiana's statutory scheme was essentially the same as the New York and Michigan laws struck down in *Granholm*.  The Commission then issued a bulletin warning Indiana wineries that it would begin enforcing the prohibition of direct wine shipments.  (Letter from Heath to Indiana Farm Wineries (May 20, 2005) (Doc. No. 51).)  Although it took several months, seven wineries obtained a state court order enjoining the state from enforcing this ban.  *See S.L. Thomas Family Winery, Inc. v. Heath*, Cause No. 49D060511PL045032 (Marion Ind. Superior Court Nov. 23, 2005).

Reacting to this flurry of legal and regulatory action, the Indiana General Assembly amended its direct shipment law.[4]  It deleted the former language that focused on out-of-state shippers and made the direct shipment prohibition enforceable against all persons, whether out-of-state or in Indiana.  Ind. Code § 7.1-5-11-1.5.  However, it created an exception for anyone holding a Direct Wine Seller's permit.[5]  *Id.*

---

[3](...continued)
to ship or cause to be shipped an alcoholic beverage directly to an Indiana resident who does not hold a valid wholesaler permit under this title."

[4]  The Winegrowers say the legislation was a compromise resulting from discussions, negotiations, and lobbying by the wineries and other groups.  (Amicus Mem. 2.)

[5]  Indiana Code § 7.1-5-11-1.5 now reads:

(continued...)

3

This permit was a new creation, and the Legislature enacted numerous rules for its issuance.  *Id.* § 7.1-3-26-1 to -16.

To obtain a Direct Wine Seller's permit, the applicant (1) had to hold a federal and state license to manufacture wine, (2) be qualified by the Indiana Secretary of State to do business in Indiana, (3) file a surety bond with the Alcohol and Tobacco Commission as required by another statute, currently in the amount of $1,000, and (4) pay a permit fee of $100.  *Id.* §§ 7.1-3-26-6, 7.

There were numerous restrictions.  The applicant could not hold a permit or license from any state to wholesale alcoholic beverages, have distributed any wine through a wine wholesaler in Indiana within the last 120 days, have annual Indiana sales of more than 500,000 gallons of wine, or be the parent, subsidiary, or affiliate of another entity manufacturing any alcoholic beverage.  *Id.* § 7.1-3-26-7.

The Legislature also imposed rules on a permit-holder's sales of wine by direct shipment.  The seller had to (1) label the shipping container for delivery only upon signature by a recipient 21 years or older, (2) instruct the carrier to verify the recipient's age at delivery, (3) refrain from shipping more than 216 liters of wine to any customer, and (4) pay all excise and other taxes due.  *Id.* § 7.1-3-26-9.  Annual direct shipments in

---

[5](...continued)
Except as provided in IC 7.1-3-26, it is unlawful for a person in the business of selling alcoholic beverages in Indiana or outside Indiana to ship or cause to be shipped an alcoholic beverage directly to a person in Indiana who does not hold a valid wholesaler permit under this title.  This includes the ordering and selling of alcoholic beverages over a computer network (as defined by IC 35-43-2-3(a)).

Indiana by any one permit holder were limited to 27,000 liters of wine, which amounts to 36,000 standard bottles or 3000 cases of wine.  *Id.* § 7.1-3-26-12.

Foremost among the restrictions was the rule that a permit-holder could direct ship only to customers who had provided, "in one initial face-to-face transaction at the seller's place of business," their names, telephone number, proof of their age by a state issued driver's license or identification card, and a sworn statement that they were Indiana residents, over twenty-one years of age, and intended the wine only for personal consumption.  *Id.* § 7.1-3-26-6.

The General Assembly made other changes, such as removing the residency requirements for the issuance of wine wholesaler, beer wholesaler, and farm winery permits.  (*See* House Enrolled Act No. 1016, Intervenor's Notice Legislative Action Ex. A  (Doc. 75).)  Of relevance here, the statutes formerly allowed a winery to sell its wine by the glass or bottle to consumers on its premises and at one alternative location approved by the Commission.  The revisions expanded the direct marketing area.  A winery now may sell, in addition to onsite, in an outside area next to its premises, at a non-profit farmer's market, at a trade show or exposition with approval, and at up to three additional approved locations.  *Id.*; *see also* Ind. Code §§ 7.1-3-12-5, 7.1-3-13-5.

 All of these changes took effect on March 24, 2006.  The net result was that an Indiana winery could sell directly to customers in Indiana by obtaining a Direct Wine

Seller's permit and directly to customers outside of Indiana through its Farm Winery Permit.[6]

Plaintiffs filed their Amended Complaint on April 28, 2006.  The litigation centers on the constitutionality of the direct shipment prohibition under the State's revised regulatory scheme.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of fact is material if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When deciding a motion for summary judgment, the court must consider all evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party.  *See id.* at 255.  The moving party "bears the initial responsibility" of identifying specific facts within the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  When a motion for summary judgment is made and properly supported, the non-moving party may not rest on the

---

[6]  The direct shipment law, Ind. Code § 7.1-5-11-1.5, prohibited shipments *to Indiana residents* except through a Direct Wine Seller's permit, while the farm winery regulations, *id.* § 7.1-3-12, allowed shipments to *out-of-state customers.*

pleadings or denials but must set forth the specific evidence showing there is a genuine

issue of material fact that requires a trial.  Fed. R. Civ. P. 56(e).  A mere scintilla of

evidence will not do.  *Anderson*, 477 U.S. at 252.   At the summary judgment stage, the

judge's function is "to determine whether there is a genuine issue for trial."  *Id.* at 249.

Unless both sides stipulate to the facts or to a trial based on the documents

before the court, cross-motions for summary judgment are treated the same.  *Lac

Courte Oreilles Band v. Voight*, 700 F.2d 341, 349 (7th Cir. 1983).  "[S]ummary

judgment will not lie unless, construing all inferences in favor of the party against whom

the motion is made, no genuine issues of material fact exists."  *Id.*  When material

issues of fact exist, neither party is entitled to summary judgment.

## IV.  DISCUSSION

### A.  *Standing and Ripeness*

Both the State and the Wholesalers contend the Amended Complaint should be

dismissed for lack of justiciability.  They argue the Plaintiffs lack standing because

Grand Traverse has not shown "any significant effort" to sell wine directly nor attempted

to obtain Direct Wine Seller or Farm Winery permits and because the Consumer

Plaintiffs have not alleged that any out-of-state winery is prepared to ship wine to them.

(Def.'s Mem. Supp. Second Cross-Mot. Summ. J. [hereinafter Def.'s Mem.] 11-13;

Intervenor's Mem. Supp. Cross-Mot. Summ. J. [hereinafter Intervenor's Mem.] 16-21.)

7

The Wholesalers also contend that Grand Traverse's request to be in court is premature and therefore not ripe for review.  (Intervenor's Mem. at 21-24.)  They assert that Plaintiffs are challenging the disparate impact of the laws before anyone knows how out-of-state wineries will be affected.  (*Id.* at 21-22.)  They say there is no certainty that Grand Traverse would not qualify for a Direct Wine Seller's Permit.  (*Id.* at 22.)  They point out that Indiana recently issued a Direct Wine Seller's permit to a California winery, even though California licenses its wineries to sell at wholesale and a Direct Wine Seller's permit is unavailable under Indiana law to anyone holding a license to sell at wholesale.  (*See* Intervenor's Ex. B-11.)

To support their arguments, the Wholesalers cite to a district court case, *Coulombe v. Jolly*, 447 F. Supp. 2d 1117, 1122-23 (C.D. Cal. 2006), in which the court found that a Virginia wine retailer, a California resident, and a Texas resident all lacked standing to challenge the constitutionality of California's direct shipping laws, which prohibited the shipping of wines to states that did not grant reciprocal privileges.  The California resident had sought to import wines from the Virginia retailer, and the Texas resident had stated his intent to ship wines to his parents.  *Id.* at 1118-19.  Despite these specific allegations, the district court nonetheless found that the plaintiffs lacked standing because they failed to allege specifics about their attempts and none faced any hint of prosecution.  *Id.* at 1122-23.

The court does not find the *Coulombe* decision to be a useful guide to the law of standing in this circuit.  (The decisions of other district courts or those in other circuits

carry no precedential weight.)  Nor are the State's and Wholesalers' arguments persuasive.

The doctrine of standing is, at its core, aimed at ensuring that litigation is about an actual case and controversy – a jurisdictional requirement imposed by Article III of the Constitution.  Although the Supreme Court has, over the years, refined its standards for establishing standing, the principle has remained constant that courts do not have jurisdiction over hypothetical or speculative claims.  Rather, a plaintiff seeking relief must show a personal stake in the outcome such that the plaintiff's interests will sharpen the adversarial presentation of issues.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (*citing Baker v. Carr*, 369 U.S. 186, 204 (1962)).

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Court set forth the "irreducible constitutional minimum" needed to satisfy the case and controversy requirement.  A plaintiff must show (1) an "injury in fact", (2) a fairly traceable causal connection between its injury and the challenged conduct or action, and (3) a likelihood that a favorable decision will redress its injury.  *Id* at 560-61; *see also Massachusetts v. EPA*, --- U.S.---, 127 S. Ct. 1438, 1453 (2007).  At the summary judgment stage, the Plaintiffs cannot rest merely on their allegations.  As the party seeking the court's jurisdiction, they must submit admissible evidence that supports their claim of standing . *See Lujan*, 504 U.S. at 561; *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).  However, only one Plaintiff must have standing for jurisdiction to exist.  *See Massachusetts*, 127 S. Ct. at 1453.

9

For the purposes of standing, an injury in fact need only be an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent.  *See Lujan*, 504 U.S. at 560.  Here, the Plaintiffs have alleged that the State wine regulations, which bar them from shipping wine, have invaded their ability to engage in interstate commerce.  *See, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 448 (1991) (declaring a right to engage in interstate trade free from restrictive state regulation).[7] The state statute clearly prohibits out-of-state wine shipments except to the extent allowed by the regulations.  If the Plaintiffs are correct that the statute is unconstitutional, then they have suffered an injury.

Grand Traverse has provided sufficient evidence of an actual interest that is concrete and particularized, going beyond the sort of concern shared by any member of the public.  *See Lujan*, 504 U.S. at 573-74 (noting the Court's repeated holdings that a citizen's general grievance seeking the proper application of the Constitution does not confer standing).  Mr. O'Keefe states that many of Grand Traverse's visitors seek to order wine directly, that he has received requests over the telephone and Internet for wine to be shipped into Indiana, and that the winery would do so if the law allowed.[8] (O'Keefe Second Aff. (Doc. No. 89) ¶ 7.)  Mr. O'Keefe also testified that he makes more

---

[7]  Although some debate may remain over whether the Commerce Clause provides a right to individuals or merely allocates power between sovereigns, even Justice Kennedy, in his dissent in *Dennis*, acknowledged that the Dormant Commerce Clause may give rise to a legal interest sufficient to establish standing.  *See Dennis*, 498 U.S. at 879.

[8]  Mr. O'Keefe also stated that the company wants to ship wine directly to Indiana retailers and restaurants although the company doesn't sell to retailers and he "believe[s] in going through wholesalers."  (O'Keefe Dep. 8, 21, 27.)  The State disputes Grand Traverse's desire to ship to retailers.  (*See* Def.'s Mem. 11.)

profit from sales to consumers directly than to wholesalers and retailers.  (O'Keefe Dep. 71-72.)

The standing of the Consumer Plaintiffs may be a closer question.  They have not submitted admissible evidence of failed attempts to order wine from out-of-state wineries since the revised statutes took effect.  However, they have testified to (1) an interest in wine that sets them apart from the general public, (2) their inability to obtain many wines they desire from Indiana wholesalers and retailers, and (3) their intent to make significant purchases of out-of-state wine through direct shipments if allowed. (*See* Webber & Dickerson Aff. (Doc. No. 45) ¶¶ 3-4, 7, Aug. 30, 2005; Webber & Webber Aff. (Doc. No. 116) ¶¶ 11, 15-16, December 2006; Larry J. & Kitty Buckel Aff. (Doc. No. 44) ¶¶ 4-5, 7 (first sentence), 10-11, Oct. 3, 2005; Buckel & Buckel Aff. (Doc. No. 116) ¶¶ 2-5, Sept. 11, 2006; Baude Aff. (Doc. No. 116) ¶¶ 4, 6, 8.)[9]  Whether Indiana's regulatory scheme does indeed prevent out-of-state wineries from directly shipping to Indiana residents to the extent that in-state wineries may do so is an issue that goes to the merits of this litigation, not standing.

A plaintiff need not be the "immediate target of a statute to challenge it" so long as injury exists.  *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000). As the Seventh Circuit stated in the earlier challenge to Indiana's direct shipment law,

---

[9]  State has objected to portions of these affidavits.  Additionally portions of the earlier affidavits would be irrelevant, even if admissible, as a result of the changes to Indiana's law. The paragraphs cited, however, are uncontested and admissible to show Plaintiffs' interest in wines, inability to obtain wines they desire, and intent to buy such wines through direct shipment if allowed.

"anyone who has held a bottle of Grange Hermitage in one hand and a broken corkscrew in the other knows this to be a palpable injury."[10]  *Id.* at 849.  These Plaintiffs, as well as Grand Traverse, have provided sufficient evidence to establish an injury in fact.

The other two *Lujan* requirements, causation and redressability, are met as well. The Court takes judicial notice of the California, Oregon, and Washington statutes, which provide wineries in those states with wholesaling privileges, thus making them ineligible for a Direct Wine Seller's permit under Indiana Code § 7.1-3-26-7(a)(6)(A). *See* Cal. Bus. & Prof. Code § 23358; Or. Rev. Stat. § 471.223(1)(b); Wash. Rev. Code § 66.24.170(3). [11]  Plaintiffs also submitted an affidavit from Michael Sweeney, the owner and operator of Cherry Hill Vineyard in Rickreall, Oregon.  (Sweeney Aff. ¶ 6.) Although most of the affidavit is, or could be construed as inadmissible hearsay, the Defendants have not contested the admissibility of Sweeney's statement that travel from his winery to Indiana is an all day affair costing him several hundred dollars, additional evidence of  the barrier that the face-to-face requirement imposes on out-of-state wineries and potential Indiana consumers.[12]

---

[10]  Grange Hermitage is an expensive Australian red wine.  *See, e.g.*, Verity Edwards, *Cheerful But Not So Cheap Any More*, The Australian, April 26, 2007, at Features 12.

[11]  *See* n.27 *infra.*

[12]  Mr. Sweeney states that he has received numerous "telephone, mail and Internet requests from Indiana residents who have never visited my winery in person, for wine they would like to be sold and shipped to them in Indiana." (Sweeney Aff. ¶ 5.)  The State objects to this statement, among others, as hearsay.  (Def.'s Reply 16.)  Perhaps to the extent that this statement reflected his personal knowledge, it might be admissible under the residual exception of Federal Rule of Evidence 807 as evidence of the winery's refusal to ship wine to locations in

(continued...)

12

A court decision enjoining the State from enforcing the statute would provide the Plaintiffs with all the relief they are seeking. Grand Traverse could ship wine directly to Indiana residents; the Consumer Plaintiffs could place orders with out-of-state wineries.

This leaves the closely related issue of ripeness, the doctrine declaring that a court will hear no litigation before its time (to paraphrase a once familiar marketing slogan). Ripeness is called into question when more acts or events are needed to illuminate the issues that should govern the case. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985)).

Here, the essence of the Wholesaler's ripeness challenge is that Plaintiffs are seeking a pre-enforcement review of the constitutionality of Indiana's laws governing direct wine shipments.[13] Although the Wholesalers have themselves moved for summary judgment – presumably believing there are no factual disputes of importance and that they are entitled to judgment as a matter of law – they argue that the facts are

---

[12](...continued)
Indiana, although not of the actual residence of the prospective customers. To invoke the residual exception, however, the statement must bear the hallmarks of trustworthiness characteristic of other hearsay exceptions and the party offering the statement must give notice of its intention to rely on the rule. *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 167 (3d Cir. 1995). No such notice appears to have been provided.

[13] Although the Wholesalers bring their ripeness challenge against Grand Traverse only, they have raised the same issue with respect to the Consumer Plaintiffs' standing. Given that questions of standing and ripeness may often merge, *see Smith v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994), the court's ripeness discussion applies also to the Wholesaler's contentions that Consumer Plaintiffs have not factually developed their claims.

incomplete.  (Intervenor's Mem. 21-22.)  They assert Consumer Plaintiffs have not

provided sufficient information about the out-of-state wineries whose products they wish

to buy and that Grand Traverse, which has not applied for a permit, has no evidence on

how the Commission will administer the wine regulations.  (*Id.*)

In *Abbott Laboratories  v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other

grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977), the Supreme Court outlined a

two-fold inquiry into whether a pre-enforcement review of an agency rule or regulation is

ripe.  To determine whether an issue is ripe, a court should evaluate (1) "the fitness of

the issues for judicial decision" and (2) "the hardship to the parties of withholding court

consideration."  *Id.*  The Supreme Court has used the *Abbott Laboratories* test in other

cases involving agency regulations.  *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 479-80 (2001); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162 (1967).

In cases contesting the constitutionality of a law, the Supreme Court has used

other tests, depending on the challenge involved. *See Renne v. Geary*, 501 U.S. 312,

339 (1991) (Marshall, J. dissenting) (citing prior cases in which the court has decided

whether a pre-enforcement challenge to a law is ripe by considering (1) the likelihood

that the plaintiff will disobey the law, (2) the certainty of disobedience, (3) any injury

arising from the threat of enforcement, and (4) the likelihood of enforcement).

Nonetheless, the Seventh Circuit and most courts have employed the *Abbott

Laboratories* test to determine if pre-enforcement review of a law's constitutionality is

appropriate.  *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d

879, 881-82 (7th Cir. 2003); *Triple G. Landfills, Inc. v. Bd. of Comm'rs*, 977 F.2d 287,

14

289 (7th Cir. 1992).[14] "Inquiries into ripeness generally address two factors: first whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and, second, whether the parties would suffer any hardship by the postponement of judicial action." *Triple G.*, 977 F.2d at 289.

Here the Plaintiffs are not contesting an agency's regulations or even its administration of the state statutes, but rather the constitutionality of the direct shipment law. In this sense, their challenge is facial. Although they claim that the claim is discriminatory in effect, this does not mean that they are challenging the law as applied. Rather, they are asserting that there are no circumstances, under the laws as written, in which the Indiana's direct shipping law are not discriminatory in effect and unconstitutional. Their challenge is to the substance of this law, not its application.

The relevant issues are sufficiently focused. As in *Abbott Laboratories*, the issues before the court are primarily legal. For the most part, the parties do not dispute the facts, only their relevance to the issues before the court. One exception is their dispute about the interest of minors in ordering wine over the Internet – an issue that the Supreme Court considered in *Granholm*. Even here the parties do not greatly dispute the numbers each side has submitted. Their submission of various studies and reports flags a potential battle of experts that could require a fact-finder to weigh the evidence

---

[14] The Seventh Circuit has also employed the more involved test discussed by Justice Marshall in *Renne*. *See Wis.'s Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 411 (7th Cir. 1984) (stating that a request to declare a state law unconstitutional requires a stringent ripeness determination involving several factors such as the magnitude of the threat that the law will be enforced, the consequences risked by the plaintiff, and whether the plaintiff has been forced to alter his conduct).

should the degree of underage interest in direct wine shipments be material to the resolution of this case.  But see *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995) (stating that in "[i]n constitutional law, to say that such a dispute exists . . . is to require a decision for the state").  However, this does not mean the issues are not sufficiently focused.  The constitutionality of the laws as written does not depend on the outcome of future events.

In determining the hardship to the parties of delaying consideration, one factor the court may consider is the likelihood of enforcement.  The Wholesalers contend this is still unknown.  For example, the statute stating the qualifications for a Direct Wine Seller's permit states:

> The commission may issue a direct wine seller's permit to an applicant who meets all of the following requirements: . . . (6) The applicant: (A) does not hold a permit or license to wholesale alcoholic beverages issued by any authority; and (B) is not owned in whole or in part or controlled by a person who holds a permit or license to wholesale alcoholic beverages.

Ind. Code § 7.1-3-26-7(a).

By these terms, this statute does not allow a winery in those states such as California, where wineries are licensed to wholesale their product, to obtain a Direct Wine Seller's permit.  State's counsel asserted as much in oral argument, stating that the statute cannot be read otherwise.  Nonetheless, the Wholesalers submitted evidence showing that the State approved a Direct Wine Seller's permit to one California winery, Pine Ridge Winery, LLC.  (Intervenor's Ex. B-11; Def.'s Resp. Interrog. No. 7 at 5.)  The application was approved even though the winery indicated a

16

possible interest in a wholesaler permit.[15]  The form did not ask the winery directly whether it had a wholesale license.

The State's failure to enforce the wholesaler prohibition in one instance does not mean this statute or others pertaining to the direct shipment law are unlikely to be enforced.  (The absence in Pine Ridge's application form of any references to a Direct Wine Seller permit suggests the winery submitted its application using an old form that had not been revised to take into account the Direct Wine Seller statute.)  Other evidence before the court suggests that state officials are serious about enforcing the alcoholic beverage statutes.  Following *Granholm*, Defendant Heath directed that an enforcement bulletin "be broadly disseminated in order to provide a clear statement of Indiana's alcoholic beverage laws."  (Heath Aff. (Doc. No. 51) ¶ 7, Nov. 21, 2005.)  Similarly, Indiana Excise Police Superintendent Alex D. Huskey declared the police agency's commitment to reducing "the access and availability of alcohol" products to minors.  (Huskey Aff. (Doc. No. 52) ¶ 7.)  Enforcing the direct shipment law and related statutes would presumably help accomplish this goal.

The likelihood of enforcement is but one consideration in determining the hardship to a party of delay in a pre-enforcement review.[16]  Hardship may also be

---

[15]  The winery checked the "yes" box in response to the following question: "Does the permittee have an interest in any distiller, vintner, farm winery, rectifier, brewer, primary source of supply, or wholesaler permit?"  (Intervenor's Ex. B-11.)

[16]  This is an area where *Coulombe* and the Ninth Circuit decision on which it was largely based, *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc), seem to diverge from the Supreme Court's *Abbott Laboratory* line of cases.  *But see Nat'l Audubon Soc. v. Davis*, 307 F.3d 835, 850 (9th Cir. 2002) and *City of Auburn v. Qwest*, 260

(continued...)

17

established if "the mere threat of future enforcement has a present concrete effect . . . and 'irremediably adverse consequences' would flow from a later challenge." *Metro. Milwaukee Ass'n of Commerce,* 325 F.3d at 882 (quoting *Reno v. Catholic Social Servs.*, 509 U.S. 42, 57-58 (1993)).

In this case, a threat of enforcement no more substantial than the mere publication of the statutes, which follows as a matter of course in various form upon enactment, will undoubtedly have concrete effects. Many, if not most, out-of-state wineries will decide whether to engage in direct shipping based on the state's laws, rather than on the efficacy of State's enforcement efforts (or the wording of an application). The Consumer Plaintiffs will not be able to obtain the products of these companies. And the restriction of interstate commerce could conceivably remain unchecked for years until some winery decided to test the statute's constitutionality by risking prosecution. As the Wholesalers acknowledged,[17] the ripeness doctrine does not require a plaintiff "to face the Hobson's choice between forgoing behavior that he believes to be lawful and violating the challenged law at the risk of prosecution." *Smith v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994).

Plaintiffs have submitted sufficient evidence of their standing to litigate, and the court is satisfied that their claims are ripe.

---

[16](...continued)
F.3d 1160, 1172 (9th Cir. 2001) (both cases distinguishing *Thomas* to allow pre-enforcement review when laws or ordinances impose a burden prior to prosecution).

[17]  (*See* Intervenor's Mem. 22-23; *see also* Pls.' Reply/Resp. Cross-Mots. 22.)

### B.  Commerce Clause

The Constitution grants Congress the power to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  This grant of authority not only allows Congress to enact laws that affect the interstate commerce in some manner; it also limits the ability of states to enact laws that impede the interstate flow of goods.  The Commerce Clause protects the principle "that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation."  *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949).  This is not a guarantee of a market unfettered by restrictions on methods of operation or business structure.  *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978).  The Commerce Clause guarantees an open market, not an unregulated one.

The Dormant Commerce Clause's restraint on state power has limits, particularly when a state is exercising its powers over traditional matters of local concern, such as public health and safety.  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981).  Here, the State and Wholesalers insist the State is doing just that.  They assert that the wine regulations are aimed at protecting minors, ensuring the efficient collection of taxes, and maintaining the state's three-tier distribution system, which serves the first two interests.  As the Wholesalers noted in oral argument, the Twenty-first Amendment makes the regulation of alcohol a matter of utmost local concern.  Nonetheless, it does not authorize or permit discrimination against interstate commerce in violation of the Commerce Clause.  *Granholm*, 544 U.S. at 466.

19

*1. Commerce Clause Analysis*

The Supreme Court has developed two tests for determining whether a state law violates the Commerce Clause.  When a plaintiff establishes that a statute, either on its face or in its practical effect, clearly discriminates against interstate commerce, then the statute is subject to heightened scrutiny.[18]  A state must show that it has a legitimate purpose for this discrimination and that it cannot achieve its ends through less discriminatory means.  *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt Auth.*, --- U.S. ---, 127 S.Ct. 1786, 1793 (2007); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390, 392 (1994) (citing *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) and *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).  If, on the other hand, the statute serves a legitimate state interest and burdens interstate commerce only incidentally, then those challenging the statute must establish that the burden on interstate commerce clearly outweighs the purported benefits sought by the state.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Whether the burden is tolerable will depend "on the nature of the local interest" and whether that interest could be promoted by measures "with a lesser impact on interstate activities."  *Id.*

---

[18]  The State and Wholesalers have referred to this standard as "strict scrutiny," a term usually reserved for equal protection cases.  Under the strict scrutiny test, the government must show a "compelling" interest, not just a legitimate one, and that its statute is narrowly tailored to serve that interest.  *Johnson v. California*, 543 U.S. 499, 505 (2005).  By comparison, under a "rational basis" review, legislation will be upheld if the government has a legitimate interest and the statute is "rationally related" to achieving that interest.  *Lawrence v. Texas*, 539 U.S. 558, 579 (2003) (O'Connor, J., concurring).  The "heightened scrutiny" test in Commerce Clause is significantly different.  If a statute clearly discriminates against interstate commerce, the state need only show a "legitimate interest," as in rational basis review.  However, the state must then establish that no less discriminatory means are available, an arguably heavier burden than the narrow tailoring of strict scrutiny.

20

The parties disagree about which test should be applied, and understandably so, because the determination of the test largely controls the outcome.  Plaintiffs contend that Indiana's statutes are clearly discriminatory in practical effect and therefore subject to heightened scrutiny.[19]  (Pls.' Am. Br. Supp. Second Mot. Summ. J. [hereinafter Pls.' Am. Br.] 11-17.)  If so, then the law favors the Plaintiffs because the State has submitted almost no evidence of its inability to achieve its goals through less discriminatory means.

The State and the Wholesalers argue that the Indiana's wine regulations must be judged under the *Pike* test because the statutes are neutral on their face and are not discriminatory in effect.[20]  (Def.'s Mem. 16-17; Intervenor's Mem. 28-41).  If so, then the law favors the Defendant and Intervenor-Defendant because the Plaintiffs have offered little explanation as to why the burden on out-of-state wineries is clearly excessive in relation to the benefits sought.[21]

---

[19]  A heading in their brief also suggests the statutes are discriminatory on their face. (Pls.' Reply/Resp. Cross-Mots. 11.)  The statutory language does not distinguish between in-state and out-of-state wineries, and Plaintiffs' arguments are directed to the practical effect of these statutes, however obvious it may be.

[20]  The State asserts that Plaintiffs must demonstrate that the "ordinance is unduly burdensome or discriminatory" for heightened scrutiny to apply (Def.'s Reply 11), but this misstates the issues somewhat.  The need to show that an ordinance is *unduly burdensome* arises after it is clear that the discrimination is incidental.  If the statute is clearly discriminatory, then the degree of burdensomeness is irrelevant.  "[A]ctual discrimination, whenever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred."  *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994).

[21]  Or, at the very least under Pike, a factual dispute would remain on whether the burden was clearly excessive.  (Although, if the burden imposed no discriminatory effect, rational basis review would apply.  Then the very existence of a factual dispute would require summary judgment for the Defendant and Intervenor-Defendant.  *See Nat'l Paint & Coatings*

(continued...)

As a practical matter, the Supreme Court has acknowledged there is "no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  The Seventh Circuit has described the difference between a statute clearly discriminatory in effect and one with only incidental burdens as a matter of degree. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).  In both cases, the court must consider the disparate impact on interstate commerce.

> When the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales, the Court treats it as equivalent to a statute discriminating on terms.  When the discriminatory effect is weak, however, the Court is more willing to entertain justifications that are unrelated to the suppression of interstate commerce.

*Id.* (citation omitted).[22]

Disparate impact that is clearly discriminatory generally amounts to a form of economic protectionism.  *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (noting defendant state's acknowledgment "that where simple economic protectionism is

---

[21](...continued)
*Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995) (noting that under rational basis review "to say that such a dispute exists – indeed, to say that one may be imagined – is to require a decision for the state).)

[22] In *National Paint*, the Seventh Circuit distinguished three categories of laws affecting commerce, those that explicitly discriminate, those that appear to be neutral but bear more heavily on interstate than local commerce, and those that affect local commerce without "any reallocation among jurisdictions," that is, giving local firms a competitive advantage.  *Nat'l Paint*, 45 F.3d at 1131.  As noted by the quotation in the text above, the second category comprised two kinds of laws; those that were clearly discriminatory in effect and therefore subject to heightened scrutiny and those where the discriminatory effect was weaker but still sufficient to require analysis under *Pike*.  *Id.*  The third category involves laws that do not give local firms any competitive advantage over those located elsewhere and are therefore subject only to rational basis review.  *Id.*

effected by state legislation, a stricter rule of invalidity has been erected").  The mere

fact that a state may offer goals to justify its legislation does not make the burdens on

interstate commerce incidental.  The Supreme Court has long recognized that

legislators are generally aware of the Constitution's general prohibition of economic

protectionism.  Thus, most laws placing unequal burdens on commerce are likely to be

promoted for seemingly legitimate reasons "save for the rare instance where a state

artlessly discloses an avowed purpose to discriminate against interstate goods."  *Dean*

*Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951).  For this reason, evidence of

economic protectionism tends to focus on practical effects rather than stated intents.

*See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (declaring that, when considering

the purpose of a challenged statute, this Court . . . will determine for itself the practical

impact of the law").

In *Granholm*, the determination that the Michigan and New York laws at issue

were clearly discriminatory – one on its face and the other in practical effect – was

relatively easy.  Michigan allowed licensed in-state wineries to ship directly to

consumers while out-of-state wineries could sell only to in-state wholesalers.  The

differential treatment increased the costs of out-of-state wines to Michigan consumers

and, in some cases, "effectively bar[red] small wineries from the Michigan market."

*Granholm*, 544 U.S. at 474.

New York did not ban direct shipments altogether.  Rather it required out-of-state

wineries to open a branch office and warehouse in New York before they could ship

directly to consumers.  As the Court noted, "[f]or most wineries, the expense of

23

establishing a bricks-and-mortar distribution operation in 1 State, let alone all 50, is prohibitive." *Id.* at 475. The law served as an effective bar to out-of-state competition, and ran counter to the court's "admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)). Other regulations also favored in-state firms. *Id.*

The laws in this case are not so straight-forward. However, the same general principles apply, and the court therefore turns to examining Indiana's regulatory scheme in detail.

### 2. *Indiana's Regulatory Scheme*

Plaintiffs are challenging the constitutionality of Indiana's laws governing the sale and shipment of wine insofar as they "prohibit out-of-state wineries from selling and delivering wine directly to consumers and licensed retail wine sellers within the state of Indiana." (Am. Compl. ¶ 1.) Their starting point is the regulation that prohibits the direct shipping of wine to anyone but an Indiana wholesaler. The statute reads:

> Except as provided in IC 7.1-3-26, it is unlawful for a person in the business of selling alcoholic beverages in Indiana or outside Indiana to ship or cause to be shipped an alcoholic beverage directly to a person in Indiana who does not hold a valid wholesaler permit under this title. This includes the ordering and selling of alcoholic beverages over a computer network (as defined by IC 35-43-2-3(a)).

Ind. Code § 7.1-5-11-1.5.

Plaintiffs are mainly concerned, however, with Chapter 26 , which authorizes a Direct Wine Seller's permit in exception to this general prohibition. Specifically they are

challenging the provisions of Chapter 26 that restrict permits to wineries that do not have any wholesale privileges and limit sales to Indiana customers with whom the permit holder has had at least one face-to-face transaction.  *Id.* §§ 7.1-3-26-7(a)(6), 7.1-3-26-6(4), 7.1-3-26-9(1)(A).

Before turning to these provisions, however, the court will address Plaintiffs' separate challenge to the statutes creating a Farm Winery Permit.  Here, Plaintiffs' concern is aimed not so much at the statute itself, but at the additional disparities it creates between in-state and out-of-state firms in their ability to do business with Indiana consumers – as further reasons for expanding the direct shipment privileges for out-of-state firms.

a.  The Farm Winery Permit

On its face, the Farm Winery Permit is equally available to applicants in Indiana and nonresidents, and the permit allows its holder to sell wine on the winery's premises. It also allows wineries to sell their products not just on their premises but also in an outside area immediately adjacent to its premises, at a non-profit farmer's market, at a trade show or exposition with approval, and at up to three additional approved locations. Ind. Code § 7.1-3-12-5.

Plaintiffs argue that out-of-state wineries are only technically eligible for a Farm Winery Permit because it does not provide them with any practical opportunity to sell their products in Indiana.  (Pls.' Am. Br. 12.)  They concede that a winery may build a facility in Indiana.  (Pls.' Reply/Resp. Cross-Mots. [hereinafter Pls.' Reply] 14.)

25

However, they assert the Supreme Court in *Granholm* explicitly held that such physical premises requirements, which can make the cost of doing business prohibitive, are impermissible. *Id.* "Allowing in-state wineries to sell directly but requiring out-of-state wineries to either use a wholesaler or build a bricks-and-mortar facility was unconstitutionally discriminatory." *Id.*

This court does not read *Granholm*'s holding to apply so expansively to all regulation of in-state sales. In *Granholm*, the Supreme Court was considering the constitutionality of New York's law requiring firms to establish a physical presence to engage in direct shipping. The court noted its suspicion of statutes requiring business operations to be performed in the statute's home state when those operations could be performed efficiently elsewhere. *Granholm*, 544 U.S. at 475 (citing *Pike*, 397 U.S. at 145). New York's physical premises requirement was not discriminatory per se but because the requirement was unrelated to the nature of direct shipping.

Here, Plaintiffs are trying to compare the limited, or non-existent, shipping rights of out-of-state wineries to the on-premises sales rights of in-state wineries. These are unrelated rights. A winery seeking the state's permission to ship its wines directly to Indiana customers is not required to have an Indiana Farm Winery Permit.[23] Its ability to ship wines directly to Indiana customers is not dependent on establishing a physical presence in the state, as it was in New York.

---

[23] However, under Indiana Code § 7.1-3-26-7(a)(8), an out-of-state winery that has sold its product through a wholesaler would need to forgo such sales for 120 days or obtain a Farm Winery Permit before applying for a Direct Wine Seller's permit.

Plaintiffs are also seeking to subsume direct mail (shipping) sales and over-the-counter retail sales under the general label of direct sales. By doing so, any disparate impact of the state's regulations will of course be magnified because over-the-counter sales, by their very nature, require a physical presence. Direct mail sales and over-the-counter sales are, however, very different operations, employing different marketing methods and, to some extent, aimed at different markets.

When the farm winery statute is considered singularly, its discriminatory effects are far from clear. The statute only restricts in-person sales to certain specified sites. To the extent that this excludes out-of-state wineries, the statue is only codifying an advantage that arises from geography. If the statute were to be stricken, out-of-state wineries would have no easier time making such sales. Customers would have to travel out-of-state to complete an over-the-counter transaction or the winery would have to send someone to Indiana to sell wine in person, whether at a farmer's market or a street corner.

If anything, Indiana's Farm Winery Permit statute ensures that out-of-state wineries seeking to increase their over-the-counter sales to Indiana residents can do so with reasonable expense. On-premises sales need not take place at a production facility. With costs that might be only slightly more expensive than those of many Indiana wineries – the higher cost of an airline ticket and shipping fees – a California or Oregon winery can obtain a Farm Winery Permit and sell its wares at an Indiana farmer's market, trade show, or exposition. Or it can set up three alternative shops, facing much the same costs as Indiana wineries would.

27

The concern in a Commerce Clause challenge arises over benefits and burdens that arise from a State's regulations, not those resulting from natural factors such as a firm's location.  The New York law held unconstitutional in *Granholm* directly imposed a burden that would otherwise not exist because a firm's in-state presence is largely irrelevant to its ability to ship its wares.  Nothing in *Granholm* suggests the Court was concerned about equalizing the inherent marketing advantage that accrues to an in-state firm because of its closer proximity to customers.  The Commerce Clause forbids states from stripping out-of-state businesses of competitive advantages they have earned.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 351 (1977).  But it does not require them to provide out-of-state firms with additional rights to compensate for existing advantages that in-state firms possess naturally.[24]

To the extent that Indiana's farm winery statute imposes an additional burden on interstate commerce – and there is little to say that it does – the burden is incidental to the State's goals of restricting sales to minors, ensuring the efficient collection of taxes, and maintaining its three-tier system.  Yet Plaintiffs have failed to submit any evidence on how out-of-state wineries are unduly burdened by the marginal hardship imposed by the farm winery statute.  They have not carried their burden under *Pike.*

---

[24]  This is not to say that the burdens of different regulations cannot be considered together.  States may attempt, for example, to equalize comparable discriminatory burdens, such as those imposed by taxes.  *See Travis v. Reno*, 163 F. 3d 1000, 1006 (7th Cir. 1998).  "[A] burden on interstate commerce imposed by one law may be offset by another, if the bottom line is substantially equal burdens."  *Id.* (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997)).  Here, however, geography, not the farm winery statute, is imposing the burden, and the Commerce Clause does not require the State to offset this.

For these reasons, the court finds that the Farm Winery Permit statute is not unconstitutional and does not violate the Plaintiffs' civil rights.[25]

b.  Direct Wine Seller Prohibition

In contrast, Plaintiffs' challenges to the Direct Wine Seller statutes are aimed at disparate burdens that do arise directly from the State's regulatory scheme.  Plaintiffs allege that the restriction of Direct Wine Seller permits to wineries that do not have wholesale privileges serves as a defacto trade barrier to most out-of-state wineries because their home states grant them wholesale rights as part of their basic license. Similarly, the requirement of an initial face-to-face transaction eliminates any incentive for most out-of-state wineries to obtain a permit because their potential market is limited to occasional travelers who come to their wineries, assuming they are open for retail sales.  Neither geography nor other natural factors impose these burdens, so the alleged disparate treatment imposed by these statutes is subject to Commerce Clause scrutiny.

i.  The Wholesale Interest Prohibition

In its terms, the prohibition against wholesale interests in the Direct Wine Seller Permit statute does not distinguish between out-of-state and in-state firms.  The statute

---

[25]  Three other district courts have reached the same conclusion regarding statutes regulating on-premises sales.  *See Jelovsek v. Bresden*, 482 F. Supp. 2d 1013, 1020-21 (E.D. Tenn. 2007); *Cherry Hill Vineyard, LLC v. Baldacci*, Civil No. 1:05-0153 (D. Me. Mar. 5, 2007) (adopting magistrate's decision, reported at 2006 WL 2121192, at *9  (July 27, 2006); *Hurley v. Minner*, No. CIV 05-826, 2006 WL 2789164, at *6 (D. Del. Sept. 26, 2006).

restricts permits to wineries that do "not hold a permit or license to wholesale alcoholic beverages issued by any authority" and are not owned or controlled, in whole or in part, by a person holding such a permit or license.  Ind. Code at  § 7.1-3-26-7(a)(6).

The State asserts summarily that the statute falls even-handedly on in-state and out-of-state wineries.  (Def.'s Mem. 16; Def.'s Reply 12.)  Likewise, the Wholesalers assert the statue "'visits its effects' equally upon in-state and out-of-state producers alike."  (Intervenor's Mem. 31 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987).)

This might be true if wineries were able to elect the sort of permit they desired and the scope of its privileges.  But liquor license laws are generally not written that way.  An Indiana winery cannot sign up for wholesale privileges on its application for a Farm Winery license.  Ind. Code § 7.1-3-12-2.  California, Oregon, and Washington wineries can not apply for a farm winery license without such privileges.[26]

By law, a California wine grower may sell wine and brandy "to any person holding a license authorizing the sale of wine" (that is, to wholesalers and retailers), as well as to consumers.  *See* Cal. Bus. & Prof. Code § 23358.  An Oregon winery license includes the right to sell wines at wholesale to the Oregon Liquor Control Commission or the commission's licensees.  Or. Rev. Stat. § 471.223(1)(b).  Washington wineries, at

---

[26]  Intervenor-Defendant's suggestion at oral argument that a winery might disclaim its intentions to wholesale cannot be taken seriously in the absence of statutory provisions authorizing the State to consider such disclaimers, and State's acknowledgment at oral argument the statute is enforced according to its terms.

least for now, may be their own wholesale distributor.[27]  Wash. Rev. Code §
66.24.170(3).

Undertaking a study of other state legislation is not necessary given that these
three states, in 2006, accounted for nearly ninety-three percent of bulk non-carbonated
wine and ninety percent of bottled non-carbonated wine produced in the United States.
*See* Monthly Statistical Releases, Alcohol & Tobacco Tax & Trade Bureau, U.S. Dep't
Treasury, http://www.ttb.gov/statistics/alcohol_stats.shtml (last visited Aug. 29, 2007).[28]

Thus, by the simple expedient of barring the issuance of a Direct Wine Seller
permit to wineries with wholesale privileges, the Indiana General Assembly has
effectively prevented most out-of-state wineries from obtaining such a permit.  It is hard
to imagine that the legislators who drafted the wholesale prohibition, or at least the
lobbyists who may have assisted them, were unaware of this.  Regardless of intentions,
the provision erects a concrete barrier that excludes the vast majority of out-of-state
wineries, but not instate firms, from the direct shipping market.

---

[27]  In 2005, a federal court held that Washington's statutes, which allowed in-state
wineries but not out-of-state wineries to distribute their products, to be unconstitutional. *Costco
Wholesale Corp. v. Hoen*, 407 F. Supp. 2d 1247, 1251 (W.D. Wash. 2005).  The court initially
ordered that in-state wineries not be allowed to distribute their products but stayed judgment
pending legislative action.  *Id.* at 1256.  The legislature subsequently amended a statute to
allow out-of-state wineries also to distribute their products but provided a sunset provision
retiring this privilege June 30, 2008.  For the moment, Washington Revised Code Section
66.24.170(3) remains in effect.  *See Costco Wholesale Corp. v. Hoen*, No. C04-360P, 2006 WL
1075218, at *11-12 (W.D. Wash. Apr. 21, 2006).

[28]  Based on the tabulation of monthly reports for 2006.  California alone accounts for
nearly ninety percent of all bulk still wine and nearly eighty-seven percent of all bottled still wine.
Still wines are non-carbonated wines.  Bulk production numbers for certain special wines such
as vermouth are also listed separately in the monthly reports.

Nonetheless, the Wholesalers argue that the statute is not clearly discriminatory for several, interrelated reasons.  First, they assert that the flow of interstate goods is not interrupted because the statute only regulates a method of operation, and the Commerce Clause does not protect particular methods of operation.  (Intevernor Def.'s Mem.  32 (citing *Exxon* 437 U.S. at 127).)  Second, out-of-state wineries barred from obtaining a Direct Wine Seller's Permit can still sell their product through a wholesaler, to Indiana consumers visiting their site, or by taking advantage of any one of the Farm Winery Permit's permissible sales venues.  (*Id.*)  Third, they assert that disparate treatment is only discrimination in violation of the Commerce Clause when it causes consumers to "turn preferentially" to instate suppliers.  (*Id.* at 34 (quoting *National Paint*, 45 F.3d 1132).)

This last argument may be the most subtle.  The wholesale prohibition's overall impact on interstate commerce may indeed be relatively minor.  An Indiana consumer who, as a result of Indiana's wine regulatory scheme, is unable to order a pinot noir from the Williams Selyem winery in Healdsburg, California, may be more likely to drive to the nearest wine boutique for a comparable pinot noir from Mink Vineyard in Napa, California, than to order an Indiana wine from Chateau Thomas in Plainfield, Indiana.[29] What this example also points out, however, is the statute's real protectionist target.

---

[29]  *See* Williams Selyem, http://www.williamsselyem.com/wines.html; Kahn's Fine Wines & Spirits, http://www.kahnsfinewines.com/; Chateau Thomas Winery, http://www.chateauthomas.com/store/ (all last visited Aug. 29, 2007).

The wholesale prohibition is not aimed so much at protecting Indiana's wineries as it is at guarding the bank accounts of Indiana's wholesalers. A wine connoisseur's willingness to pay $65 for Williams Selyem's 2005 Westside Road Neighbors, $36 for Mink Vineyard's 2005 Ancien, and $25 for Chateau Thomas's 2004 Pinot Noir all depend on the consumer's peculiar likes, the unique qualities of the wine, and perhaps Wine Spectator's rating. As the Wholesalers state, wine is not a particularly fungible commodity, and the inability of some out-of-state wineries to sell their products does not necessarily mean that the sale of in-state wines will increase. What is certain, however, is that Indiana consumers who demand out-of-state wines will be forced to transact their business through an Indiana-licensed wholesaler – or go without.

But this, in itself, is not a violation of the Commerce Clause. The Supreme Court has repeatedly stamped its approval on the three-tier distribution system and a state's right to exercise "virtually complete control over how to structure [its] alcohol distribution laws." *See, e.g.*, *Granholm*, 544 U.S. at 489; *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980). The three-tier system may be the chief tool by which a state's licensed liquor wholesaler companies are sheltered from greater economic competition in an age of direct mail and Internet marketing. While this may result in higher prices for consumers, the Commerce Clause does not forbid such an outcome.

The legitimacy of the three-tier system, however, does not necessarily lead to the conclusion, however, that the statute is even-handed and visits its effects equally on in-state and out-of-state producers. Under current Commerce Clause jurisprudence, the

33

wholesale prohibition can still be clearly discriminatory in effect toward out-of-state wineries even if the General Assembly's chief motivation was to protect the interests of the liquor wholesalers.

While a state may regulate the methods of business operations, as the Wholesalers state in their first argument, this does not mean that it can do so in a manner that discriminates between in-state and out-of-state companies.  The Wholesalers' reliance on *Exxon* is misplaced.

In that case, the Supreme Court found that a Maryland law, which prohibited petroleum producers and refiners from operating retail gasoline stations in the state, did not discriminate against out-of-state firms even though the burden fell entirely on out-of-state firms.  *Exxon*, 437 U.S. at 120-21.  The Court rejected the "underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market."  *Id.* at 128.  It also dismissed claims that the law was discriminatory in effect because it excluded major out-of-state oil companies from the Maryland retail market while creating a "protected enclave for Maryland independent dealers."  *Id.* at 125-26.

Superficially, Indiana's wholesale prohibition parallels the Maryland law.  The law regulates a method of operation.  It excludes, in practical effect, some out-of-state businesses while carving out a marketing niche for in-state businesses.

There, however, the similarity ends.  In *Exxon*, the law fell entirely on out-of-state firms only because there were no in-state petroleum producers.  *Id.* at 125.  Had a

34

Maryland petroleum producer or refiner, existed, it also would have had to divest its retail stations.  Moreover, all of the state's petroleum would continue to be supplied by out-of-state producers and refiners.

In analyzing whether the law was a form of discrimination in effect on the retail level, the Court noted the presence of several major out-of-state petroleum companies who did not refine or produce gasoline.  *Id.* at 126.  They were unaffected by the law and would continue to compete directly with instate Maryland dealers who were unaffected by the law.  *Id.* The law itself did not create any barriers against such companies.  *Id.* It did not restrict the flow of interstate goods.  *Id.* Nor did it impose any additional costs on out-of-state goods.  *Id.* In-state independent dealers would have no competitive advantage over out-of-state dealers.  *Id.* The court noted the complete absence of such traditional indicators of discrimination in reaching its conclusion that the law was not discriminatory.  *Id.* It was in this context that the Court declared that the Commerce Clause does not protect a particular structure or method of operation in a retail market.   The Court was not authorizing a state to discriminate against interstate commerce by requiring a particular method of operation that would protect in-state interests at the expense of interstate commerce.

The facts here differ markedly from those in *Exxon.*  The wholesale prohibition does favor local firms and provides them with a distinct advantage –  the ability to ship directly to customers – that is categorically denied to the vast majority of out-of-state firms.  The flow of interstate wine is restricted.  Some wines will not be available at all. Federal Trade Commission, *Possible Anticompetitive Barriers to E-Commerce: Wine* 18,

20 (July 2003) [hereinafter FTC Report].[30]  Other wines, at least those costing more

than $20 a bottle (which tend to be the type sought by wine connoisseurs), will be more

expensive.  *Id.* at 19, 21-22.  Forcing nearly all out-of-state wineries to use a wholesaler

or come to Indiana to sell gives in-state wineries a distinct competitive advantage.

Indeed, virtually the entire direct shipping market is limited to in-state wineries.

Wholesalers' second argument, that the wholesale prohibition only limits one

sales method, fails for many of the same reasons.  For many small wineries, direct

shipment is their only practical alternative to over-the-counter sales.  The State admitted

as much at oral argument in defending the provision that restricts Direct Sales permits

to wineries that have not used a wholesaler within the last 120 days.  Counsel asserted

that one purpose for the restriction was to limit direct shipping privileges to small

wineries – that as participation in the market increased, as evident by establishing a

relationship with a wholesaler, the amount of regulation increased as well.  This is an

acknowledgment of the practical difficulties that many small companies face in finding a

wholesaler of their products.  *See* FTC Report 6 (noting that "some small wineries may

have problems getting wholesalers to carry their labels").

More importantly, the Supreme Court rejected this very argument in *Granholm*

when it found the Michigan and New York laws to be unconstitutional.  In both states,

---

[30] Each of the parties has submitted this report as part of their evidence.  *See* Pls.' Ex.
M (Doc. No. 60);  Def.'s Ex. C (Doc. No. 104), Intervenor's Designation of Evid. (Doc. No. Ex.
107) (incorporating Pls.' Ex. M). The report is also available at
http://www.ftc.gov/os/2003/07/winereport2.pdf (last visited Aug. 29, 2007).

out-of-state wineries could sell their products through wholesalers but were prohibited from selling and shipping their wines to customers.  While Michigan law directly prohibited out-of-state firms from such activity, New York achieved the same result indirectly, by requiring out-of-state firms to establish a physical presence.  These laws were no less discriminatory because their wines could be sold through a wholesaler.  The analysis in *Granholm* focused on the direct shipping market affected by the challenged regulations, not the wine market as a whole.

The Supreme Court has also rejected Wholesaler's third argument that a statute cannot be held discriminatory without sufficient evidence that consumers are turning to in-state firms preferentially.  In *Bacchus Imports*, the state of Hawaii made essentially the same argument as the Wholesalers without success.  In an effort to promote the state's fledgling liquor industry, the Hawaiian legislature had exempted the okolehao, a locally produced brandy, and fruit wine, namely pineapple wine, from the state's 20 percent liquor tax.  *Bacchus Imports*, 468 U.S. at 265.  The state contended that the exemptions were not discriminatory because neither okolehao nor pineapple wine competed against other liquor products, whether produced in Hawaii or elsewhere.  *Id.* at 268-69.  Stated another way, Hawaii was contending that there was little evidence that the tax exemption caused consumers to turn preferentially to okolehao or pineapple wine.  The court emphatically rejected this argument.  It found that the very passage of the exemption indicated the state legislature's expectation that at least some consumers would change their drinking patterns.  *Id.* at 269.  The extent of this competition only went to the magnitude of the discrimination, not whether the law was  clearly

37

discriminatory.  *Id.*  States may not "build up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States."  *Id.* at 273

Economic protectionism does require such a tit-for-tat showing in the face of laws that are clearly discriminatory on their terms or in practical effect, and *National Paint* does not stand for the contrary, as the Wholesalers contend.

In *National Paint*, the Seventh Circuit was examining a city ordinance that forbid the sale of spray paint within the city limits.  45 F.3d at 1126.  This law was neither discriminatory on its terms nor in effect (whether strongly in effect requiring heightened scrutiny or only weakly, allowing analysis under *Pike*).  *Id.* at 1131-32.  All sales of spray paint were banned.  The issue before the court was whether the ban would cause consumers to turn to an alternative product favoring in-state firms over out-of-state companies.  *Id.* at 1132.  Under such circumstances, the companies challenging the law needed to provide some evidence of the products that consumers would turn to as a result of the spray paint ban.

*National Paint*'s holding would be directly relevant to this case if, for example, the State had banned the sale of all bottled wine within Indiana.  Then the parties challenging the law might indeed need to present some factual evidence on consumers' choices.  In the absence of any evidence showing that the wine ban was causing Indiana residents to turn to an Indiana alcoholic beverage, such as Upland Beer, the court would have no basis for concluding that the law was discriminatory.

38

In *Granholm*, the Supreme Court found the Michigan and New York laws to be discriminatory without requiring direct evidence that in-state wineries were gaining the sales lost by out-of-state firms.  *See Granholm*, 544 U.S. at 473-476.  Similarly, the court can conclude that Indiana's wholesale prohibition, which takes advantage of other state's laws to erect an absolute legal barrier to most out-of-state firms, is also clearly discriminatory.  Despite their peculiarities, many wines are comparable in taste, appeal, and quality, and at least some Indiana residents will probably order Indiana wines, or additional Indiana wines, through direct shipment when out-of-state wines cannot be obtained that way.  The wholesaler prohibition is subject to heightened scrutiny.

Both the State and the Wholesalers cite the protection of the state's three-tier distribution system as the goal served by the wholesale prohibition.  However, neither of these parties have offered much in the way of an explanation as to how a winery's possession of wholesale privileges in another state is relevant to the protection of Indiana's three-tier system.  A license to wholesale goods in California, Washington, or Oregon is not a license to wholesale goods in Indiana.

The three-tier distribution system was never a magical good in itself but a means of obtaining more efficient tax collection and regulation, protecting consumers from price-gouging by vertically integrated businesses, and promoting competition and other

benefits.  These are the State's interests, its legitimate purpose.[31]  Yet there is little in the record to show how the wholesale prohibition, as written, serves these ends.

Even assuming that it does, the statute cannot stand unless the State's interests cannot reasonably be achieved in other ways.  Neither the State nor the Wholesalers have offered much evidence or argument as to why this is so.  The State implies that it should not be compelled to conform its regulations to other states' laws.  (Def.'s Reply 13.)  At oral argument, State asserted that an applicant's possession of a license with wholesale privileges was a snapshot "shorthand" that allowed an agency reviewing thousands of applications a year from having to undertake further investigation into whether the winery was, in fact, a wholesaler (and, presumably, a wholesaler of the sort that might threaten the State's interests.)  The State's convenience, however, is not a sufficient basis for adopting a statute that is clearly discriminatory.

By law, Indiana wineries can obtain a license to ship wines directly to Indiana consumers.  By operation of law, most out-of-state wineries cannot.

For these reasons, the court finds that the wholesale prohibition violates the Commerce Clause when it bars wineries holding wholesale privileges in states other

---

[31]  Wholesalers' argument that the three-tier system is itself the legitimate purpose (Intervenor's Mem. 34-35) is a backdoor way of evading *Granholm*'s instruction that the Twenty-first Amendment does not give a state authority to discriminate in violation of the Commerce Clause.  If the state's legitimate goal was merely to preserve the status quo, then of course there would be no alternative means of achieving that goal.  *Granholm*'s holding would be meaningless.

than Indiana from seeking a Direct Wine Seller's permit.  To this extent, Indiana Code

Section 7.1-3-26-7(a)(6) is unconstitutional.

  ii.  The Face-to-Face Requirement

  The statute requiring an initial face-to-face transaction is less obviously

discriminatory.  The State's interest is clearer.  The connection between the statute and

the interest is more transparent.

  The Direct Wine Seller permit allows a winery to sell and ship wine directly to an

Indiana resident but only after the resident has provided the following information in

"one initial face-to-face transaction:"

> ●his or her name, telephone number, residential or business address,
> ●proof of age through a driver's license or state-issued identification car, and
> ●a sworn statement under penalty of perjury that the prospective customer is at least twenty-one years of age, has an Indiana address, and intends to use the wine for personal use only.

Ind. Code §§ 7.1-3-26-6(1),(4); *see also id.* § 7.1-3-26-9.

  The State contends face-to-face identification is an important means of

preventing the sale of alcohol to minors.  (Def.'s Mem. 7, 17.)  All winery staff in Indiana

involved in selling alcohol are licensed by the State and must receiving training on

Indiana's age verification requirements and in identifying false or altered identification.

(Heath Aff. (Doc. No. 104) ¶ 15, Nov. 15, 2006.)

  Although the parties agree that preventing alcohol sales to minors is a legitimate

and important State goal, they disagree about how effective "face-to-face" requirements

actually are in preventing sales to minors.  Excise Police Superintendent Huskey, for example, testifies that the face-to-face transaction requirement "in any sale of alcohol . . . is an effective barrier to youth access to alcohol.[32]  (Huskey Aff. (Doc. No. 52) ¶ 6.)  Yet other studies have shown that minors often avoid face-to-face requirements by getting adults to buy for them, through fraudulent identification cards, or other means.  *See* Nat'l Research Council, *Reducing Underage Drinking: A Collective Responsibility* 166-168 (2004) (available at Pls.' Ex. R (Doc. No. 89) 10-12)).  Alcohol remains fairly easy to get, as even Superintendent Huskey acknowledges. (Huskey Aff. ¶ 5.)[33]

The threshold issue, however, is whether the face-to-face requirement is a form of discrimination per se against out-of-state wine or whether the requirement only results in an incidental burden on out-of-state wineries (or on the Consumer Plaintiffs' interest in obtaining their product).

The State argues, as with the wholesale prohibition, that the face-to-face requirement is an even-handed regulation.  "Indiana law does not discriminate against

---

[32]  Plaintiffs object to the admissibility of this evidence under Federal Rule of Evidence 701. (Pls.' Reply 8 n.12, 27.)  The court observes, for the limited purposes of this Entry, that Superintendent Huskey's statement could be admissible as specialized knowledge of a police officer under Rule 702 given his background (fifteen years in law enforcement; former assistant chief of police in Marion, Indiana; former Drug Abuse Resistance Education officer; and Superintendent of the Indiana Excise Police for approximately 15 months at the time of the affidavit). (*See* Huskey Aff. ¶¶ 2, 5.)  *See also United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001) (admitting a police officer's testimony and noting the Rule 702 advisory committee comment that in "in certain fields, experience is the predominant, if not sole, basis for a great expert testimony").  Admissibility need not be considered further, however, because the court does not need to determine the effectiveness of face-to-face transaction requirements to resolve the parties' summary judgment motions.

[33]  Plaintiffs also objected to the admissibility of this statement.  (Pls.' Reply 29.)

interstate commerce, but instead simply requires that alcoholic beverages (including wine) be purchased 'in such a way that age can be verified.'" (Def.' Mem. 20 (quoting *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 214 (2d Cir. 2003).) The Wholesalers argue that any additional burden placed upon the out-of-state wineries is merely the result of geography and their decision not to open a retail outlet within Indiana, as permitted by the Farm Winery statute. (Intervenor's Mem. 37-38.)

State and Wholesalers are correct that the terms of the face-to-face requirement are neutral. Moreover, unlike the wholesale prohibition, in which the discrimination fell entirely upon out-of-state firms and left in-state wineries unscathed, the face-to-face requirement burdens in-state firms. Indeed, the statue falls at least as heavily or more so on some in-state firms than on some out-of-state firms. For example, a winery in Fremont, Indiana (171 miles from Indianapolis, Indiana, and 227 miles from Bloomington, Indiana), may be as inaccessible to most Hoosiers as a winery in Paris, Illinois, (100 miles from Indianapolis and 88 miles from Bloomington, Indiana).[34] But, as the parties know, the overwhelming number of out-of-state firms are not located close to Indiana's borders. They are hundreds of miles away. For any winery to ship wine to an Indiana resident, the customer must first visit its premises, and so the degree of the burden imposed by the statute is directly related to the wineries' distance from Indiana.

---

[34] Federal wine licenses are listed to wineries with the trade name of Satek Winery in Fremont, Indiana, and to A. Westbrook Cellars in Paris, Illinois. Alcohol & Tobacco Tax & Trade Bureau, Wine Producers & Blenders - July 2007, available at http://www.ttb.gov/foia/wine_producers.xls (last visited Aug. 29, 2007).

In practical effect, the statute discriminates far more heavily against out-of-state wineries.

The result is not so dissimilar as another attempt by Indiana to discriminate against interstate commerce.  In *Government Suppliers Consolidating Services, Inc. v. Bayh*, 975 F.2d 1267 (7th Cir. 1992), the Seventh Circuit held unconstitutional laws that restricted trash haulers from using their vehicles to carry any other products, such as food or furniture.  The district court found the laws to be facially neutral regulations aimed at protecting the public's health and the reputation of Indiana products.  *Id.* at 1273.  The plaintiffs argued that the law fell disproportionately on out-of-state trash-haulers because Indiana waste companies could afford to dedicate their trucks to a single use.  Hauling trash to Indiana from out-of-state, however, only made economic sense when the trucker was carrying another cargo on the return trip, or "backhaul."  *Id.* at 1272-73.  Nonetheless, the district court did not consider the fact that the statute would apply most often to out-of-state haulers to be discrimination per se, and therefore applied the lesser scrutiny required under *Pike*.  *Id.* at 1277-78.

The Seventh Circuit rejected both the lower court's reasoning and conclusion.  "A determination that a statute does not discriminate on its face and 'purports to regulate evenhandedly' does not end the question of which scrutiny should apply."  *Id.* at 1278.  What matters is the overall effect on in-state and out-of-state activity.  *Id.* (citing *Brown-Forman*, 476 U.S. at 573).  The circumstances surrounding the statute's enactment suggested the State's goal was economic protectionism.  *Id.* at 1278-79.  However, the court did not probe legislators' motives.  Rather, it was sufficient that "the practical

44

impact of the backhaul ban would be to reduce very significantly the inflow of out-of-state waste by raising the cost of disposing of such waste in Indiana." *Id.* at 1279.  The court found the statutes at issue to be clearly discriminatory and therefore subject to heightened scrutiny.[35]  *Id.*

As several Supreme Court cases make clear, the fact that some in-state firms may be burdened by a regulation does not mean that a statute is not clearly discriminatory.  *See, e.g.,  Fort Gratiot Sanitary Landfill v. Mich. Dep't of Natural Res.*, 504 U.S. 353, 367-68 (1992) (holding unconstitutional a law that prohibited disposal facilities from accepting waste outside their county unless authorized by the county's solid waste management plan); *Dean Milk*, 340 U.S. at 298, 354 n.4 (finding a state law regulating milk sales to be protectionist and noting that it was "immaterial" that some in-state milk producers were affected as much as out-of-state milk producers).

Here, the face-to-face transaction requirement falls significantly more heavily on out-of-state wineries.  Not only is travel to such wineries many times more expensive, simple economics prohibits most of these firms from taking advantage of Indiana's Farm Winery Permit and reaching out to customers through sales at non-profit farmer's markets or by establishing bricks-and-mortar alternative sales sites in Indiana.

---

[35]  Although the Seventh Circuit found the statutes unconstitutional under the per se test of heightened scrutiny, the court nonetheless observed that the State's rationale for the discrimination was so weak that its statutes were unconstitutional under the *Pike* test.  *Gov't Suppliers*, 975 F.2d at 1285-86.

The statute does not merely codify a natural geographic advantage, as the Wholesalers argue.  Although shipping rates may be affected by distance, shipping itself is a means of overcoming a firm's lack of presence in some area.  Here, as with the New York statute in *Granholm*, the face-to-face requirement effectively requires the out-of-state wineries to establish a physical presence in the state or accept the greatly reduced sales that might result from the occasional traveler.  In most cases, such sales would hardly justify the cost of obtaining a Direct Wine Sales permit and posting the required statutory bond.  As in *Granholm*, the law effectively requires out-of-state firms to become residents, if only temporarily, to compete.

The face-to-face transaction requirement does not survive the discrimination per se test of heightened scrutiny.  The court accepts at face value the State's worthy goal of protecting minors from the sale of alcohol.  There is no need to rehash the numerous studies showing the harm to developmental growth, fatal accident rates, and other injuries resulting from the mix of minors and alcohol.  The issue is whether there are no other reasonable alternatives.

Plaintiffs have offered two alternatives.  First is the restriction in the statute itself, which requires the shipping carrier to verify the age of the person receiving the shipment.  (Pls.' Am. Br. 18.)  Second is the Plaintiffs' suggestion that the State could require shippers to use a third-party age verification service such as ChoicePoint.  (*Id.*)

Neither the State nor the Wholesalers have carried their burden, even at the minimum level necessary to survive summary judgment, of showing the unavailability of

other reasonable alternatives.  The State merely declares that the Commission has no experience with Internet verification services such as ChoicePoint and therefore "lacks the quantitative data to assess the[ir] effectiveness."  (Def.'s Mem. 8.)  The Wholesalers concede that "the face-to-face method may not be foolproof" but "it is at the very minimum reasonable, and that is all that is required."  (Intervenor's Mem. 40.)  That is not, however, all that is required, even under the *Pike* test, which is not applicable here.[36]

To survive heightened scrutiny, the State must show that it cannot achieve its goals through less discriminatory means, and neither the State nor the Wholesalers (on the State's behalf) have attempted to meet this burden.  Commissioner Heath's affidavit that the face-to-face transaction "fosters a regulatory environment which prevents access to alcohol by minors" says nothing about whether other mechanisms might be devised.  (Heath Aff. ¶ 13, Nov. 15, 2006.)

Nor does Superintendent Huskey's conclusory opinion that direct shipping "outside of the permitting framework in Indiana and in the absence of a face-to-face

---

[36] In citing to *Minnestoa v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), the Wholesalers appear to have confused the *Pike* test with rational basis review.  The Wholesalers' cite, *id.* at 464, was to the Supreme Court's discussion of the plaintiff's Equal Protection Clause challenge.  Later in the decision, the Supreme Court addressed the milk seller's Commerce Clause challenge under the *Pike* test.  The Court concluded that a statutory prohibition of plastic containers did not restrict the movement of milk products across Minnesota's border and that the interstate burden was slight "since most dairies package their products in more than one type of containers."  *Id.* at 472.  The Court acknowledged the statute might shift business from plastic manufacturers to paper mills "but there is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms.  *Id.* at 472-73.  In contrast, there are ample reasons why the wholesale prohibition and the face-to-face requirement penalize out-of-state wines and their manufacturers while protecting the ability of in-state wineries to engage in direct shipping.

transaction would significantly constrain the ability of Indiana Excise Police to prevent access to alcohol by minors."  (Huskey Aff. ¶ 9.)[37]  Supported by facts and studies, this statement might begin to create a material issue of fact.  Standing by itself, Superintendent Huskey's opinion does not address the effectiveness of other measures that might be undertaken within the State's permitting framework or under another regulatory scheme.

Plaintiffs have mentioned two alternatives, but the court notes there are other possibilities.  First, Indiana's scheme does more than require the shipping carrier to verify the recipient's age.  If the face-to-face transaction requirement is eliminated, any customer ordering wine will still have to supply the winery with his or her name, telephone number, address, proof of age, and a sworn statement made under penalties of perjury that the customer is at least 21 years of age, has an Indiana address, and is ordering the wine for personal use.  Ind. Code §§ 7.1-3-26-6, 7.1-3-26-9.  The shipper must also stamp the shipping container with a label stating "CONTAINS WINE. SIGNATURE OF PERSON AGE 21 OR OLDER REQUIRED FOR DELIVERY" and direct the carrier to verify the recipient's age.[38]  Ind. Code §§ 7.1-3-26-9(2)(B), (D).

---

[37]  Defendants have objected to Mr. Heath's and Superintendent Huskey's statements as not being permissible lay testimony under Federal Rule of Evidence 701, but see note 33 *supra*.

[38]  In comparison, for the sale of common fireworks, a well-documented source of injury each year, the State formerly required purchases to provide only "a written and signed assurance" that the fireworks would be taken out of state within five days.  Ind. Code. § 22-11-14-4 (2005), *amended by* Pub. L. 187-2006.  Of course, retailers had no means of ensuring that purchasers actually did so.  Here, in addition to requiring the purchaser to supply identifying information and a sworn statement under penalty of perjury, wineries must instruct their shipping agents to verify that recipients are at least 21 years old.  These carriers could and should be expected to refuse delivery to persons failing to provide proof of age.

Neither the State nor the Wholesalers have submitted any evidence showing that these additional requirements, along with the required carrier verification, will not achieve the same level of compliance with the State's minimum age law as the face-to-face transaction.  Moreover, these requirements could be stiffened in any number of ways.  For example, the State could require that the sworn statement and a photocopy of the prospective customer's driver's license or state identification card be notarized.  Such steps would seem far more susceptible to enforcement given that an out-of-state winery can be compelled to deliver copies of these records to the commission.  *See* Ind. Code § 7.1-3-26-9(2).  In contrast, enforcement of the face-to-face transaction requirement will depend on voluntary compliance by out-of-state wineries – or extensive travel by the State Excise Police.

There are other regulatory frameworks.  For example, the U.S. State Department requires persons seeking their first passport (which is needed for foreign travel) to appear in person, but it does not require them to come to the State Department itself.  *See* Passports, U.S. Department of State, http://travel.state.gov/passport/passport_1738.html (last visited Aug. 29, 2007).  Rather, a person may apply for a passport at any one of 8,000 passport acceptance facilities, which are authorized agents of post offices, public libraries and various government offices.  Similarly, a state could require customers wishing to have wine shipped directly to them appear before an agent of the state, such as an officer or employee of a state police post, and obtain a license to receive wine by direct shipping.

49

The court is not suggesting these alternatives – only that alternatives exist, even if they require additional legislation or regulation.  *See* Ind. Code 7.1-2-3-7 (setting forth the boundaries of the Commission's rule-making authority over enforcement and permittees' conduct of business).  Whether they would be feasible or desirable is for the State to determine.  So long as the law or regulation treats in-state and out-of-state firms equally, in practical effect, the Commerce Clause is satisfied.  The key point is that the State has only offered Huskey's conclusory statement to show that it cannot protect Indiana's youth through less discriminatory means.  This is not enough.

For the reasons discussed above, the court finds that the provisions in the Direct Wine Seller Permit that require prospective customers to supply, and Direct Wine Seller permit holders to collect certain information in an initial face-to-face transaction, Ind. Code §§ 7.1-3-26-6(4), 7.1-3-26-9(1)(A), are unconstitutional but only to the extent that these provisions require that initial transaction to be made physically in person between customers and permit holders.

iii.  Other Contested Provisions

Plaintiffs initially that asserted Indiana's wine wholesaler permit also discriminated against out-of-state wineries because Indiana winemakers could form a separate corporation to apply for a wine wholesaler permit while non-residents were explicitly forbidden by statute from doing so.[39]  (Pls.' Am. Br. 13.)  However, the

---

[39]  The Plaintiffs refer to a "Limited Wine Wholesaler's Permit" (Pls.' Am. Br. 12), while the State refers to a "Micro-Wholesaler permit" (Def.'s Mem. 5).  As the Wholesalers correctly

(continued...)

Wholesalers pointed out that the statute cited by Plaintiffs, which explicitly forbid non-residents from forming a corporation to acquire a wholesale permit, had been repealed.[40]  (Intervenor's Mem. 41-42.)  Plaintiffs then abandoned their effort to show that this permit was discriminatory.  "Due to time constraints, Plaintiffs cannot adequately develop that argument, and therefor no longer seek summary judgment on this issue. The issue will be presented should the case go to trial."  (Pls.' Reply 2 n.1.)

An issue cannot be reserved for later when the opposing party has made a motion for summary judgment.  Federal Rule of Civil Procedure 56(e) requires the non-moving party to set forth specific evidence showing a genuine issue of material fact that requires a trial.

The State and Wholesalers have filed cross-motions seeking judgment in their favor on all claims.  The State asserts that Indiana residents and nonresidents are equally eligible for wine wholesaler permits and that, once obtained, "the holders, whether Indiana entities or out-of-state entities would be permitted to utilize those permits in an identical fashion."  (Def.'s Mem. 17.)  Wholesalers have cited statutes

---

[39](...continued)
point out, Indiana law does not literally create a limited or micro permit.  (Intervenor's Mem. 6 n.3.)  Rather, the statute merely charges a lesser fee of $100, instead of the regular fee of $2,000, to wine wholesalers with annual sales of less than 12,000 gallons of wine and brandy. Ind. Code § 7.1-4-4.1-13(c).

[40]  The statute, Ind. Code § 7.1-5-9-5 (repealed 2004), made it unlawful for a person to use or employ a domestic or foreign corporation as a means of allowing a nonresident to acquire an interest in a beer wholesaler's permit.  (Pls.' Am. Br. 13 & 13 n. 16.)  This restriction would have applied to wine wholesaler permits because applicants for these permits must hold a beer or liquor wholesaler permit or meet the qualifications for holding one.  Ind. Code § 7.1-3-13-1(a)(3).

precluding a winery from having an interest in a company holding an Indiana wine wholesaler's permit (Ind. Code § 7.1-5-9-2(b) and Indiana's alcohol regulatory scheme specifically prohibits all persons from holding any prohibited interest indirectly (*Id.* § 7.1-1-2-5).

Even in the absence of any response by Plaintiffs, Wholesalers' implied assertion that wineries and wholesalers cannot be related must be taken with some skepticism. The revised statutes allow any wine wholesaler to enter into an agreement to locate on an Indiana winery's premises and to use the winery's goods and services.  Ind. Code §§ 7.1-3-13-2.5(a)(1), (2).  This suggests at least some legislative intent to create a mechanism by which wineries could wholesale their products.  (Why else would a wholesaler seek to locate its warehouse on a winery's grounds?  Or why else would a winery permit it, unless the terms were so favorable as to cast suspicion on the "independence" of the separate operations?)  Moreover, Winegrowers' brief suggests this is the case.  The Winegrowers assert that, under the current scheme, "some wineries depend entirely on direct sales to customers while others depend more on sales to retailers and restaurants."[41]  (Amicus Mem. 1.)  Acknowledging the implications of Winegrowers' brief, the State asserts that the Commission "does not recognize that any winery may lawfully sell direct to retailers or restaurants."  (Def.'s Reply 13 n.3.)

---

[41] The Winegrowers also noted that in the negotiations that led to the revised statutes, "Indiana wineries battled to retain their ability to ship directly to customers and sell directly to retailers and restaurants."  (Amicus Mem. 2.)

The constitutionality of such winery-wholesaler arrangements, if they exist, would depend on whether out-of-state wineries can employ the same mechanism, without any restrictions such as the establishment of an Indiana facility, to sell their products to Indiana retailers.  If an out-of-state winery raised an "as applied" challenge, then the State's enforcement of its laws might become an issue.  But such a challenge is not before this court.  The State has asserted that nonresidents are on equal footing with residents when it comes to obtaining and using a wine wholesale permit, and Plaintiffs have offered neither argument, nor citations or exhibits to contradict this.  The court finds therefore that Plaintiffs have not shown a constitutional violation with the wine wholesaler permit or a factual dispute regarding its constitutionality.

Plaintiffs have made other claims directly, or in passing.  They have noted that Indiana residents who purchase wine out-of-state in person can only bring 18 liters of wine back into Indiana for each visit[42] (Am. Compl. ¶ 16) and that the "grandfather clause," which exempts wineries from the face-to-face requirement with existing customers under certain conditions, would only apply to in-state firms because direct interstate sales were previously illegal (*id.* at 16).  Plaintiffs have not developed these arguments or they are moot.[43]

---

[42]  Ind. Code § 7.1-5-11-15

[43]  The "grandfather clause" required wineries to provide the Commission by January 15, 2007, with the name and address of all existing customers that they sought to exempt from the face-to-face transaction requirement.  Ind. Code § 7.1-3-26-6(5).  Only one in-state winery took advantage of the "grandfather clause" by the deadline.  (Second Supplemental Aff. Comm'n Executive Secretary U-Jung Choe ¶¶ 4-7, March 12, 2007).  The issue is moot insofar as the court finds the face-to-face requirement to be unconstitutional.

53

Plaintiffs have also noted that Indiana law precludes a winery from obtaining an Direct Wine Seller's permit if the winery has distributed its product within the last 120 days.[44]  (Pls.' Am. Br. 5.)  While Plaintiffs referred to this restriction only once in their briefs, they implied at oral argument that the prohibition contributes to the Direct Wine Seller Permit's disparate impact on out-of-state wineries.

This they have not shown.  While the statutory provision seems blatantly aimed at protecting the interests of Indiana wholesalers, this in itself is not a Commerce Clause violation.  The provision exempts wineries that have operated as an Indiana Farm Winery from the 120-day wholesale restriction.  However, as discussed above, the Indiana Farm Winery Permit statute does not discriminate against out-of-state wineries on its face or in practical effect.  Neither the Direct Wine Seller Permit nor Farm Winery Permit statutes would seem to preclude out-of-state wineries who are selling products through a wholesaler from obtaining a Farm Winery Permit before applying for a Direct Wine Seller's permit to avoid the 120-day restriction.

An as-applied challenged to this provision is not before the court, and on its face, the disparate impact of the statute, if any, is weak.  Under *Pike*, the State would only need to offer a legitimate reason for adopting the wholesale restriction to justify such an impact, and the State has done so.  At oral argument, counsel asserted the statute helps ensure that the Direct Wine Seller Permit is an exception for small wineries.  This is a legitimate purpose and the Plaintiffs have not provided any evidence to show that

---

[44]  Ind. Code § 7.1-3-26-7(a)(8).

the burden on interstate commerce imposed by this restriction is clearly excessive in relation to this State interest, or at least a material issue of fact on this claim.

For these reasons, the court finds that Plaintiffs have failed to show a constitutional violation with respect to its additional claims.

## C.  Remedy

The parties have suggested different remedies should the court find a statute or statutes to be unconstitutional.  In their briefs, Plaintiffs have asked the court to declare Indiana's entire regulatory scheme governing direct shipments unconstitutional and to order the state to permit out-of-state wineries to sell wine directly to Indiana customers, at least until the General Assembly acts.  (Am. Compl. 7; Pls.' Am. Br. 20.; Pls.' Reply 26.)  Plaintiffs contend that when a court declares unconstitutional a statute that extends benefits to some but denying them to others, "the presumptively correct remedy is 'extension, rather than nullification.'"  (Pls.' Am. Br. 20 (quoting *Califano v. Westcott*, 443 U.S. 76, 88-90 (1979).)  Plaintiffs contend this remedy is reasonable and consistent with the Commerce Clause's goal of advancing interstate commerce.  (Pls.' Reply 25.)

At oral argument, Plaintiffs seemed to back off a bit, requesting a more limited remedy by asking the court to strike a smaller number of terms and provisions in the Farm Winery Permit and Direct Wine Seller Permit statutes.

55

At the other extreme are Wholesalers.[45]  They are asking the court to strike the Direct Wine Seller exception to the direct shipping prohibition, although they suggest the court might wish to stay entry of judgment until the General Assembly has time to cure the constitutional infirmities.  (Intervenor's Mem. 45.)  They contend that striking the wholesaler prohibition would allow "vertically integrated producer-wholesalers to sell alcohol directly to consumers," while striking the initial face-to-face transaction requirement would allow all wine sales to be made without a face-to-face requirement (thus defeating the Legislature's goal of protecting minors).  (Intervenor's Reply Supp. Cross-Mot. Summ. J. 25.)  "The proper remedy (if necessary) is the remedy that does the least violence to the intent of the legislature, which in this case would be an injunction eliminating the ability of any winery to directly ship its product."  (Intervenor's Mem. 43.)

Between these two parties are the Winegrowers and the State.  The Winegrowers have asked the court to stay any judgment to give the General Assembly "first crack" at making the choices that affect economic interests and public safety policies.  (Amicus Mem. 3.)  The State urges the court "to adopt a 'minimum damage' approach in fashioning a remedy, if such is needed."  (Def.'s Mem. 20.)  As examples of minimum damage, it offers *Costco Wholesale Corp. v. Hoen*, 407 F. Supp. 2d 1247, 1254-56 (W.D. Wash. 2005), in which the district court found that limiting in-state wineries' shipping privileges required less statutory tinkering, and *Huber Winery v.*

---

[45]  By no means do the Wholesalers concede that the statutory scheme at issue is constitutionally deficient.  They address the concept of remedy only in the event that this court finds Commerce Clause deficiencies over the Wholesalers' (and State's) vigorous protests.

*Wilcher*, 2006 WL 2457992 (W.D. Ky. Aug. 21, 2006), in which the court extended the privilege of obtaining a special license to ship wines to out-of-state firms and declared a face-to-face transaction requirement as unconstitutional but left the remainder of the state's regulatory scheme intact.  (*See* Def.'s Mem. 22.)  Thus the State appears at least somewhat ambivalent about whether constitutional violations are addressed by giving out-of-state wineries greater latitude or by restricting in-state wineries, so long as the court's interference with the statutory scheme is kept at a minimum.

The court agrees with the State at least to some extent.  As the Supreme Court has noted, a court's finding that a law is unconstitutional "'frustrates the intent of the elected representatives of the people.'"  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).  In fashioning a remedy, the Court noted three principles. First, invalidating part of a law is preferable to invalidating all of it.  *Id.*  Second, a court should refrain from rewriting a state law as much as possible.  *Id.*  Third, a court should avoid using its power to circumvent a legislature's intent.  *Id.* at 330.  "Generally speaking, when confronting a constitutional flaw in a statute, [a court should] try to limit the solution to the problem."  *Id.* at 329.

The trouble with Plaintiffs' proposed remedy is its broad sweep, striking down the state's direct shipping prohibition entirely even though the court has found only relatively minor portions of two provisions in the Direct Wine Seller Permit statute to be unconstitutional.  Similarly, Wholesalers would eliminate the entire exception, disregarding the presumed validity of many of its statutes and the Legislature's

57

expressed intent to allow wineries under certain conditions to bypass the three-tier system.  The Wholesalers presume to divine the General Assembly's preference for eliminating direct shipping privileges altogether rather than extending the privilege in some fashion to qualified out-of-state wineries.[46]  (*See* Intervenor's Mem. 43.)

In Indiana, determining legislative intent can be a risky business.  The State does not keep records of legislative debate or testimony, so the General Assembly's intent must be stated in the act itself, or inferred if possible from the wording of the statute, other statutes and its history.  While the statutes at issue do not include a statement of purpose, the overall alcohol regulatory scheme has four stated goals:

> (1) To protect the economic welfare, health, peace, and morals of the people of this state.
> (2) To regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages.
> (3) To regulate the sale, possession, and distribution of tobacco products.
> (4) To provide for the raising of revenue.

Ind. Code § 7.1-1-1-1.

In crafting a remedy in keeping with the Supreme Court's three principles, the court is mindful that it should leave as much of Indiana's regulatory scheme intact as possible.  This it has done in finding that Indiana's wholesaler prohibition is unconstitutional but only insofar as it bars wineries holding wholesale privileges in states other than Indiana from seeking a Direct Wine Seller's permit.  This ruling does not

---

[46]  After the district court in *Costco* announced its intent to limit in-state wineries' ability to self-distribute but staying entry of judgment, the Washington legislature reacted by extending the self-distribution privilege to out-of-state firms for about two years while additional study was undertaken.

interfere with the State's right to prevent vertical integration within the Indiana market and maintain the three-tier distribution system subject to the General Assembly's intended exceptions.  Nor does it interfere with the State's ability to raise revenue or make any changes materially affecting the protection of the public's economic welfare, health, peace, and morals.

Similarly, striking Indiana's initial face-to-face transaction requirement eliminates only one aspect of the State's regulation and control over the direct shipment of wine to its residents.  Nor does it erase all ability of the State to prevent shipments to minors. Wineries must still collect substantial personal information about the persons ordering wine and obtain sworn statements from them.  And the statutes require that all carriers verify that all recipients of shipments are at least 21 years of age.  These regulations remain unaffected by the court's ruling.

Finally, neither the Wholesalers nor the Winegrowers have offered compelling reasons to stay execution of judgment.  As cases cited by the Winegrowers point out, various courts, upon finding a law to be invalid, have exercised their discretion to stay judgment pending legislative action.  But in these cases, immediate execution of judgment would have required the court's further involvement or oversight.  Some have involved voting rights litigation, in which a court was staying its equitable powers to fashion its own voting plan.  *See, e.g.*, *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 501 (7th Cir. 1991).  Others have involved challenges where, in the absence of a stay, a court would have to draw up administrative rules for the dispersal of benefits. *See, e.g.*, *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 795 (Alaska 2005).  Such

59

decisions are not entirely on point with this case, where the finding of partial unconstitutionality does not require the court's further involvement.

In this case, a stay of judgment would perpetuate economic protectionism and harm to the Plaintiffs for additional months (or years, depending on the speed with which Indiana's part-time Legislature could address these issues) while providing the State with limited, or at least uncertain, benefit. No evidence has been submitted that striking the Direct Wine Seller prohibition of wholesale privileges in other states will substantially affect the State's three-tier system or its collection of taxes. Nor have the State or Wholesalers offered substantial evidence that the elimination of the initial face-to-face transaction, while leaving other requirements intact, will allow a greater number of minors to obtain alcohol. The Supreme Court discredited such claims in *Granholm*, 544 U.S. at 490, and little has changed since then.

States allowing direct shipments generally reported "few, if any, problems with interstate direct shipments of wine to minors." FTC Report 31. Some evidence suggests that minors are more interested in beer, wine coolers, and hard liquor than wine in general. *Id.* at 12 (citing a prior FTC report based on survey data showing that minors drink wine but less often than beer or spirits).[47] Moreover, most minors have more immediate, and direct, means of obtaining alcohol, such as enlisting an adult

---

[47] FTC staff could not locate any data showing the sorts of wine that minors did drink. FTC Report 12. They did find, however, that direct shipping generally provided customers with a cost advantage for wine costing more than $20 a bottle. FTC Report 21. As such, it would seem unlikely that most wineries would engage in the direct shipping of inexpensive wines when wholesalers would be able to undercut them in price.

friend to buy for them.  Nat'l Research Council, *Reducing Underage Drinking: A Collective Responsibility* 166-167 (2004).  Even eighth-grade students state that getting alcohol is "fairly easy" or "very easy."  *Id.* at 11.

On the other side are some studies suggesting that lifting direct shipment restrictions may contribute to underage drinking.  These studies are far from conclusive and sometimes subject to misinterpretation.[48]  However, even those studies that directly address Internet direct shipping often fail to distinguish between sales with companies outside a statutory framework and those within.  The same is true with other evidence.  For example, several states have conducted stings and found that minors were able to order alcohol or wine online, in some cases merely by using a credit card.  FTC Report 35.  Such sales may show the willingness of some companies to ship alcohol in disregard of a state's laws.  This black market, however, will be unaffected by Indiana's initial face-to-face transaction requirement.

The court cannot conclude, on the record before it, that striking the prohibition against out-of-state wholesale privileges or even the initial face-to-face requirement will

---

[48]  One example relates to a study of a Midwestern community that allowed home delivery of alcohol.  *See* Linda A. Fletcher et. al, *Alcohol Home Delivery Services: A Source of Alcohol for Underage Drinkers*, 61(1) J. Studies Alcohol 81 (2000) (available at Intervenor's Supplemental Material Supp. Resp. Cross-Mots. Summ. J. (Doc. No. 74) Ex. E).  The study found that ten percent of the 12th-grade students surveyed reported drinking alcohol that had been obtained this way.  *Id.* at 82.  Subsequent studies, *see, e.g.*, Nat'l Research Council, *Reducing Underage Drinking: A Collective Responsibility* 174 (2004), said the Fletcher study found that ten percent of minors obtained alcohol through home delivery *and Internet sales*, even though Internet sales were not a part of the study.  Moreover, the study did not describe who obtained the alcohol.  Thus teenagers who drank beer delivered to a keg party were among the ten percent, even though they had no involvement in ordering the alcohol.  Fletcher, *supra* at 84.  Nonetheless, the ten percent figure has been widely reported as an indicator of Internet ordering of alcohol by teenagers.  *See* Intervenor's Mem. 9.

lead to a massive surge in legal direct shipments of wine to Indiana customers. Substantial restrictions remain in place over such sales.  An out-of-state winery seeking to ship to Indiana customers must register to do business in the state, apply for a permit, pay an annual fee, post a statutory bond, collect sworn statements and personal information from potential customers, and require its carriers to follow certain procedures.  In a business of relatively modest profit margins, many wineries may conclude, as Grand Traverse did with regard to its few Virginia customers, that shipping to Indiana residents is not worth the cost of complying with the state's regulatory scheme.  (*See* O'Keefe Dep. 17 (stating "it wasn't worth our time").)

   This court's decision is likely to be of immediate interest only to those out-of-state wineries with an existing base of Indiana customers or wine connoisseurs who may have the means to persuade out-of-state firms to undertake the effort.  Indiana wineries will not need to change any of their current business practices.  Indeed, there is little likelihood that much will change before the General Assembly meets again.

   The court finds no substantial reasons to stay execution of judgment.

### V.  CONCLUSION

   For the reasons discussed above, the court finds the wholesale prohibition, Ind. Code § 7.1-3-26-7(a)(6), to be unconstitutional insofar as it bars wineries that possess wholesale privileges in states other than Indiana from seeking a Direct Wine Seller's permit.  The court also finds the requirement of an initial face-to-face transaction between a winery and customer prior to direct shipment, as described in Ind. Code §§

7.1-3-26-6(4), 7.1-3-26-9(1)(A), to be unconstitutional.  These two conditions constitute a form of economic protectionism and violate the Commerce Clause of the Constitution.

The court does not find Indiana's general prohibition of direct shipping, Ind. Code Ind. Code § 7.1-5-11-1.5, to be unconstitutional except with respect to the two specific conditions in the statutory provisions cited above.  Nor does the court find the statute allowing an Indiana farm winery to sell its product onsite and at certain other locations, Ind. Code § 7.1-3-12-5, to be unconstitutional.

The court therefore **GRANTS** in part and **DENIES** in part Plaintiffs' Second Motion for Summary Judgment (Doc. No.  89), Defendant's Second Cross-Motion for Summary Judgment (Doc. No. 102), and Intervenor-Defendant's Cross-Motion for Summary Judgment (Doc. No. 106).  The court also **DENIES** Plaintiff's Motion to Strike Intervenor-Defendant's Notice of Supplemental Authority (Doc. No. 146).

Entry of Judgment will be by separate order.

ALL OF WHICH IS ENTERED this 29th day of August 2007.


_____

John Daniel Tinder, Judge
United States District Court

63

Copies to:

Magistrate Judge Tim A. Baker

James Alexander Tanford
INDIANA UNIVERSITY SCHOOL OF
LAW
tanford@indiana.edu

Michael Joseph Donahoe
EPSTEIN COHEN DONAHOE &
MENDES
donahoem@aol.com

Robert David Epstein
EPSTEIN COHEN DONAHOE &
MENDES
rdepstein@aol.com

Chadwick C. Duran
OFFICE OF THE INDIANA ATTORNEY
GENERAL
cduran@atg.state.in.us

Robert B. Wente
OFFICE OF THE INDIANA ATTORNEY
GENERAL
robert.wente@atg.in.gov

Thomas M. Fisher
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Tom.Fisher@atg.in.gov

Brian J. Paul
ICE MILLER LLP
brian.paul@icemiller.com
ATTORNEY TO BE NOTICED

Fred R. Biesecker
ICE MILLER LLP
fred.biesecker@icemiller.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com

April Edwards Sellers
BAKER & DANIELS
april.sellers@bakerd.com